JOHN J. DAVIS, CHARLES R. LONG, VIRGINIA M. LONG, EMILY M. DOWNS, CLARENCE J. HELLMAN, ROBERT ALEXANDER, BESS F. DAVIS, WINTHROP NEWALL BREED and UNITED STATES TRUST COMPANY, EXECUTORS OF THE WILL OF JOSHUA B. F. BREED, deceased, McKEE GREER and LOUISVILLE TRUST COMPANY, EXECUTORS OF AND TRUSTEES UNDER THE WILL OF FRANK T. GREER, deceased, EDWIN T. BREED, LILLA N. BREED, ISAAC F. STARKS and ARTHUR C. SCHUFF,

*vs.*

LOUISVILLE GAS AND ELECTRIC COMPANY, a corporation of the State of Delaware.

*New Castle, June* 1, 1928.

*Josiah Marvel*, of the firm of Marvel, Layton & Morford and *James I. Boyce*, and *Percy N. Booth* and *John J. Davis*, both of Louisville, Ky., for complainants.

*Andrew C. Gray*, of the firm of Ward & Gray, and *Clarence A. Southerland* and *John H. Roemer*, of the firm of Cummins, Roemer & Flynn, of Chicago, Ill., for defendant.

THE CHANCELLOR. The complainants are holders of Class B stock. They contest the right of the defendant to amend its certificate of incorporation in the manner proposed for two reasons—first, because the corporation is without lawful power to adopt the amendment, and second, conceding the power to exist, the changes proposed by the amendment are nevertheless unfair, inequitable and a fraud upon the complainants, and should therefore be enjoined.

Logically the first contention should be disposed of first, because if it be well grounded the second need not be considered.

First, then, has the corporation power under the law to adopt the amendment in question? The complainants concede that if the defendant corporation has the power which the amendment to *Section* 26 of the *General Corporation Law*, under which the defendant was incorporated, undertakes to confer upon corporations, then the question of power to adopt the capital changes proposed must be answered in favor of its exercise. The corporation was created in 1913. That the corporation possessed all the powers conferred upon it not only by its certificate of incorporation, but as well those which the act itself conferred upon all corporations created under it, cannot be questioned. *Peters v. U. S. Mortgage Co.*, 13 *Del. Ch.* 11, 114 *A.* 598; *Morris, et al., v. American Public Utilities Co.*, 14 *Del. Ch.* 136, 122 *A.* 696; *Bouree, et al., v. Trust Francais, Inc.*, 14 *Del. Ch.* 332, 127 *A.* 56. *Section* 26 of the act is the section dealing with amendments to corporate charters, and the power to amend conferred by that section as it existed at the time this corporation was created was consequently conferred upon it by the law creating it. The complainants contend that the power to amend thus conferred on the defendant at the time of its creation by *Section* 26 of the

act was not such as to embrace within its scope a power to effect so fundamental and radical a change in the corporate structure as the proposed alteration contemplates. Whether this contention is tenable will not now be considered. For the moment, it will be assumed that it is and that the power to effect changes of the kind under consideration was not conferred by *Section* 26 as it existed in 1913 when the defendant was created.

The *Section* (26) was amended in 1927 (35 *Del. Laws, c.* 85, § 10). Power to enact amendments was reserved by the state in *Section* 82 of the act under which the defendant was created. That section provides:

"This chapter may be amended or repealed, at the pleasure of the Legislature; * * * this chapter and all amendments thereof shall be a part of the charter of every such corporation except so far as the same are inapplicable and inappropriate to the objects of such corporation."

*Section* 26 in its 1927 amended form was so worded as to confer upon corporations a power to amend their certificates of incorporation sufficiently comprehensive to embrace the sort of amendment proposed to be effected by the defendant in this case. The complainants concede this. But they argue, the defendant cannot justify the proposed amendment under *Section* 26 as amended in 1927, for the reason that it was beyond the power of the Legislature to authorize such a change in the contractual relations existing between the corporation and its stockholders and between the stockholders *inter sese* as the proposed amendment to the certificate contemplates. The contract now subsisting between the corporation and its members as well as among the stockholders of the two classes, gives to the B common the right to retire the A common at $32.50 a share, and when a certain point is reached in distributing earnings as dividends a further right to receive thereout one dollar to every twenty-five cents paid to the A stock. These rights, say the complainants who are B stockholders, constitute material and fundamental contract rights which they now enjoy and which but for the power conferred by the 1927 legislation the corporation and the majority of stockholders however great could not take from them without their consent. Hence it follows, they argue, that in so far as the 1927 enactment undertakes to disturb these rights,

it is invalid as an act impairing the obligation of a contract.

In support of this contention reference is made to the case of *Morris, et al., v. American Public Utilities Co., supra,* wherein the threefold nature of a corporate contract is pointed out. In that case it was said that a corporate charter embodies a contract with three aspects. It creates a contractual relation between the creating sovereign and its corporate creature, between the corporation and its stockholders and between the stockholders *inter sese.* The complainants insist that when a state creates a corporation and reserves to itself a power to alter or amend the creating act, it must be understood that the reserved power of amendment can extend only to that phase of the contract which concerns the interest of the state and its public policy; and that it cannot be extended so far as to touch or in any wise tamper with the purely private aspects of the corporate contract as it exists between the corporation and its stockholders and between the classes of stockholders *inter sese.* Such they say is the limitation put upon the power reserved by the state to alter or authorize the alteration of corporate charters; and the amendment of 1927, they insist, authorizing the disturbance as it does of the purely private contractual phases of this defendant's charter, extends beyond the bounds of this limitation and consequently is of no force and effect as against the complainants whose rights were defined before its enactment.

In this connection the complainants cite the case of *Garey v. St. Joe Mining Co.,* 32 *Utah,* 497, 91 *P.* 369, 12 *L. R. A:* (N. S.) 554. In that case the defendant company was organized in 1897 and its stock was declared by the certificate of incorporation to be full paid and non-assessable. Under the law as it existed at the time of the defendant's incorporation, it was provided that the liability of stock for assessment should not be changed without the consent of all the stockholders. In 1903 the act under which the defendant was created was so amended under the reserved power of amendment as to authorize corporations existing under it to alter the liability of stock to assessments upon the vote of two-thirds of the stockholders. The corporation undertook, by more than a two-thirds vote, but by less than a unanimous vote, to render its stock assessable, relying upon the authority

of the amendment of 1903 as a justification for its action. The court held that the reserved power of the state to amend the act under which the defendant was created did not extend so far as to impair or authorize the impairing of the existing contract between the company and its stockholders, that the amendment of 1903 if applicable to the defendant would so impair the existing contract and was therefore unavailable to the defendant as a justification for its attempted act. The Utah court, while recognizing that authority might be found at variance with its conclusion, nevertheless considered that the result reached by it was more in line with the general principles of law as stated by the text-writers, and accordingly adhered to the view that the power of amendment reserved by the state was confined in its operations to that phase of the corporate contract in which public interests and purposes, as distinguished from private interests, were concerned, and the assessability of stock for purposes of the corporation was a question in which public interest or policy could be in no wise involved.

The line of demarcation between what constitutes a matter of public as distinguished from one of private interest in corporate activities is admittedly exceedingly difficult to define. The very fact that the general corporation acts found in the various states deal in great detail with innumerable aspects of the contract in what upon a glance would be regarded as relating to its private as distinguished from its public character, has some force to suggest that the state, by dealing with such subjects in the statute rather than by leaving them to be arranged by the corporate membership, has impliedly impressed upon such matters the quality of public interest and concern. Certain it is that the state in authorizing the creation of corporations is interested as a matter of public policy in seeing to it that its corporate creatures shall possess such powers as are best calculated to promote the corporation's welfare, advance its interests, and facilitate the meeting of its business and financial needs. Questions having to do with stock, its kinds, classes, preferences, participations and qualifications, which a corporation may issue, are questions that are most intimately bound up with the future welfare of the corporation and may have a most material relation to the con-

tinuance *in esse* of the entity which the state has created. Nor is it unreasonable to assume that the state, thus recognizing the vital importance to the corporate life of questions dealing with its capital structure, further recognized the unwisdom of casting in an unchanging mould the corporate powers which it conferred touching these questions so as to leave them fixed for all time. May it not be assumed that the Legislature foresaw that the interests of the corporations created by it might, as experience supplied the material for judgment, be best subserved by an alteration of their intracorporate and in a sense private powers, and, in the interest of a public policy which coveted their successful progress, have meant to reserve to itself by the general amendment clause a right to alter or enlarge such powers? The Utah case above referred to apparently answers this question in the negative. The case of *Hinckley v. Schwarzschild & S. Co.*, 107 *App. Div.* 470, 95 *N. Y. S.* 357, answers it in the affirmative. The New York case was one where a corporation had only one class of stock. The law at the time of its creation, provided that no preferred stock could be issued except by unanimous consent of all the stockholders. A later amending act authorized the issuance of preferred stock upon the affirmative vote of two-thirds in amount of the stockholders. The defendant, in the absence of a unanimous consent, but with the approval of two-thirds of the outstanding stock undertook to amend its certificate by authorizing the issuance of preferred stock. The power to effect the amendment was assailed on the ground that the power reserved by the state to amend the act could not extend so far as to permit the authorization of an alteration in the contract rights which the stockholders enjoyed against the corporation. Thus the precise question in principle was raised as was presented in the Utah case. The Appellate Division took the view that the reserved power to amend was broad enough to embrace the amendment in question, and that stockholders had taken their rights subject to its exercise. Said the court:

"Within this power [to alter and repeal] under this rule must necessarily fall the right to change the capital stock of the corporation as to amount, kind and classification. In effect it must be deemed to exhibit the policy of the state adopted to promote the corporate purpose, enhance its welfare, and extend its business. * * *

"As we have already seen, the imposition of an additional obligation, the extension of corporate purpose whereby the value of the stock is impaired, and creating inequality in shares of stock, have all been supported as a valid exercise of legislative power which does not infringe upon vested rights or rights of contract."

Of like effect is the case of *Somerville, et al., v. St. Louis M. & M. Co. of Montana*, 46 *Mont.* 268, 127 *P.* 464, *L. R. A.* 1915*B*, 811. In that case the Supreme Court of Montana re-affirmed a previous ruling made by it to the effect that the power reserved by the state to amend its general corporation law might "be exercised, not only to alter the contract as it exists between the state and the corporate entity, but as well to alter the contract existing between the corporation and its stockholders, and the stockholders *inter sese*."

It is to be noted that the language by which the power to amend was reserved by the Legislatures in Utah, New York and Montana is quite different from that found in our *Section* 82. In those states, the power to amend was simply reserved and there allowed to rest. Even where such was the case, as we have seen, the New York and Montana courts take a view at variance with the Utah court. But here in Delaware the Legislature did not content itself with a bare expression of the reservation of power to amend. It proceeded further to say that the chapter as it was originally enacted "and all amendments thereof" should be a part of the charter of every corporation created under it. Thus all future amendments to the act were written by that language into the defendant's charter as effectively as was the original act.

The precise question here under discussion has never been raised in this state. It was latent in the case of *Morris, et al., v. American Public Utilities Co.*, 14 *Del. Ch.* 136, 122 *A.* 696, but was not raised as is evident from the language of the opinion where it was said—"There is no question raised by the case as to the extent of the power reserved by the state to amend, alter or repeal the act under which the defendant holds its corporate charter." Nor was the question involved in *Peters v. U. S. Mortgage Co.*, 13 *Del. Ch.* 11, 114 *A.* 598, cited by the complainants.

The conclusion I reach on this branch of the case is that the power reserved by the Legislature to amend the act under which

the defendant was created, and subject to which every stockholder acquired and holds his stock, is broad enough to embrace within its purview the amendment of 1927. Even conceding, if need be, that the power of amendment reserved by the Legislature can extend only to those matters that are of public concern, yet it does not follow that the amendment here under debate is to be condemned. This is for the reason that the problem of financing corporate needs is so vital to the continuance in existence of corporations created under the act, the matter of stock, its kinds, classifications and relative rights, is so intimately associated with that problem, that it is difficult to escape the conclusion that the character of the statutory regulations defined by the Legislature for the meeting of that problem might very well be regarded as affected with a public interest and concern. The peculiar language of the clause by which the power of amendment was reserved by our statute would in itself point to this conclusion.

In view of the foregoing, it follows that the amendment to the act adopted in 1927 is applicable to the corporation defendant in this case. If it is, then it is conceded that so far as the question of power is concerned, the proposed alteration of the certificate of incorporation has statutory warrant.

But there is another feature of the case which removes the question from all doubt. I refer to the clause in the defendant's original certificate of incorporation which is as follows:

"This corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation in the manner now *or hereafter* prescribed by statute, and all rights conferred on stockholders herein, are granted subject to this reservation."

Stockholders of course hold their stock subject to the exercise by the corporation of this reserved power. By the language referred to, the corporation took to itself not only all the powers of amendment of its charter which the statute at the time of its creation conferred, but also all which the statute might thereafter confer. There was thus an agreement between the corporation and its stockholders that the power of amendment to the full extent that future legislation might authorize its exercise was reserved to the corporation. In point of power, therefore, it is as though the act of 1927 were a part of the law at the time

the corporation was created, in which case there could be no debate concerning the corporation's rights. The only response which the complainants make to this suggestion is that the quoted language of the certificate must be taken to mean no more than this—that the corporation meant to consent to only those changes in the law which the state might enact within the appropriate field of its alleged constitutional power, that is, to such changes as affect the corporate contract in that one of its phases which concerns the state as distinguished from those phases that concern the corporation and its stockholders and the latter *inter sese;* and that the amendment of 1927 being of a nature that fails to fall within the former category, the corporation never consented to be bound by it. This argument is not acceptable for the following reasons. In the first place, there is nothing in the quoted language which justifies it. In the second place, if the corporation meant to accept only such amendments to the law as the state might adopt in alteration of its own contract with the corporation, and not such as might affect the contract *intra* the corporation, the language of the amendment is clearly language of supererogation, for admittedly the assent of the corporation to statutory amendments of that kind was not necessary to make them applicable. Why should the corporation take pains to express assent to changes in the law to which it was bound in any event to submit? It is to be assumed that by using the language something more was meant to be expressed than what would have already been conveyed by its absence. In the third place, the language in the certificate is not couched in the phraseology of assent. It is expressed in the terms of a power reserved. I know of no reason why a corporation should not be permitted to agree with its stockholders that it shall have all powers then conferred upon it by the act of its creation as well as all powers which subsequent amendments to the act might authorize. The word "hereafter" in the quoted language of the certificate seems to me to indicate such an agreement.

I am aware that if the language of the quoted clause in the certificate has the meaning and effect just attributed to it, the discussion found in the preceding part of this opinion is unnecessary. In view of the fact however that the point covered by it

was raised and argued and that it is bound to arise sooner or later, I deemed it advisable to express my views upon it.

Because of the conclusion that the power conferred by the amendment to *Section* 26, adopted in 1927, is available to the defendant, it becomes unnecessary to consider whether, under the act as it existed prior thereto and at the time of the creation of the defendant, power existed in the defendant to adopt the change in its articles now proposed. The defendant contends that the power did exist, for the reason that in substance the proposed change amounts to but an alteration in a preference enjoyed by the B stock, a sort of alteration which in the absence of the 1927 amendment was already permissible. *Peters v. U. S. Mortgage Co., supra.* This contention, if examined, would invite discussion of the question, whether or not the B stock's right, after a certain point is reached in the distribution of earnings, to receive dividends in the proportion of four for itself to one for A, can be called a preference within the meaning of the act. An examination of the contention, though interesting, will not be undertaken.

Second, the power being found to exist to adopt the proposed amendment of the certificate, are its terms so unfair and inequitable as to constitute a fraud on the complainants who hold B stock? This question is assumed by the parties to be a pertinent one. That the amendment, if adopted, will take from B stock certain material rights which it now enjoys cannot be doubted. The defendant is said to be in a prosperous condition and its business and earnings appear to be growing at a satisfactory rate. By taking away the right to redeem the A stock at $32.50 a share, the complainants argue that the B stock is deprived of the opportunity to retire on favorable terms that stock as a sharer with it in the earnings which have every prospect of increasing in amount. But, it is argued, a more glaring injustice is proposed to be done to the B stock by the proposal that when a certain point shall have been reached in disbursement of earnings as dividends, the distribution shall thereafter be in equal proportions to A and B instead of in the proportion now provided for of four to one, that is on the basis of one dollar to B for every twenty-five cents to A. The complainants calculate that from the present financial statement of the company the proposed

change would enable the directors by a dividend declaration out of earnings now on hand to divert something over $200,000 to A stock which, if the proposal be not adopted, would go to B stock.

All this, they argue, is unfair, inequitable and a fraud on the B stockholders. The defendant justifies the proposed change as one that is for the best interest of the corporation and for the stockholders as a whole. The company is a growing one and is in need of additional funds for its expansion. Such additional funds, it says, can be best and most advantageously obtained by the sale of its A stock. Sale of that stock with its present redemption feature and its restricted dividend participations cannot in the judgment of the managing board of directors be effected in sufficient amount to meet the company's needs and upon terms regarded as advantageous. The complainants disagree with this view. We have then a conflict in view between the responsible managers of a corporation and an overwhelming majority of its stockholders on the one hand and a dissenting minority on the other—a conflict touching matters of business policy, such as has occasioned innumerable applications to courts to intervene and determine which of the two conflicting views should prevail. The response which courts make to such applications is that it is not their function to resolve for corporations questions of policy and business management. The directors are chosen to pass upon such questions and their judgment unless shown to be tainted with fraud is accepted as final. The judgment of the directors of corporations enjoys the benefit of a presumption that it was formed in good faith and was designed to promote the best interests of the corporation they serve.

In *Bodell v. General Gas & Electric Corp.*, 15 *Del. Ch.* 420, 140 *A.* 264, the Supreme Court of this state said:

"If in the particular case there is nothing to show that the directors did not exercise their discretion for what they believed to be the best interest of the corporation, certainly an honest mistake of business judgment should not be reviewable by the court."

The same principle was recognized by this court in *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*, 14 *Del. Ch.* 1, 120 *A.* 486; *Id.*, 14 *Del. Ch.* 64, 122 *A.* 142, and expressly

stated in *Robinson v. Pittsburgh Oil Refining Co.*, 14 *Del. Ch.* 193, 126 *A*. 46.

When the majority of the stockholders speak for the corporation upon extraordinary occasions as the directors do in the usual course of events, a like presumption in favor of the bona fides of their decision should prevail.

Turning now to the facts of this case in so far as they are disclosed, it is impossible to find anything in the way of an ulterior motive on the part of either the directors or the majority stockholders vitiating their judgment or attacking in any way the honesty and good faith of their action. The bill charges that the present management of the defendant owns or controls not only about ninety per cent. of the B stock but also a substantial amount of the Class A stock, the stock which will be most benefited by the proposed amendment. Thus a self-serving purpose is attempted to be fastened upon the controlling majority. But the answer completely refutes this charge. It appears that ninety per cent. of the Class B stock (the only voting stock) is owned by Standard Gas & Electric Company; that none of the Class A stock is owned by that company; that of the directors five own about 8,110 shares of Class A stock, two of the five own 2,000 shares of Class B, and the remaining ten directors own no shares of Class A stock; neither do any of the directors of Standard Gas & Electric Company, the controlling stockholder, own any of the defendant's Class A shares.

It thus appears that rather than there being a personal interest to be served on the part of the directors and the controlling stockholder by advantaging the A stock at the expense of the B stock, quite the contrary is shown. If Class B stock is to be so greatly injured by the proposed change as to indicate a fraud upon it, it is apparent that the stockholder in the corporation which holds ninety per cent. of that stock and which will consequently be most injured by the supposed fraud has itself supplied the votes essential for its perpetration and thereby inflicted great harm upon itself. This may argue stupidity on the dominant stockholder's part, a thing hardly to be granted, but it cannot argue a motive for or inducement to fraud.

The only other suggestion that is made attacking the bona

fides of the controlling directors and majority stockholder is that the holder of the ninety per cent. of Class B stock does not wish to jeopardize its voting control by selling more of that stock for the purpose of raising additional funds, and so it has resorted to the plan of raising funds through proposed sales of Class A and to that end seeks to make Class A more attractive to investors by eliminating its present undesirable features by the amendment in question. This suggestion cannot be accepted. It is too much of a speculation. I cannot see why, if retention of voting control was the controlling thought in the mind of the dominant voting stockholder, it could not have devised some plan of re-classification of stock that would have put that control beyond danger without at the same time doing the supposed injury to itself which the complainants charge the present amendment inflicts.

It is not at all unusual for corporations to erect their capital structures in some such manner as the defendant's structure will be after the proposed amendment is effective. Yet the stock ranking as will the B stock in this case finds favor with the investing public. The holder of ninety per cent. of that stock evidently thinks that its interests will be best subserved by favoring the amendment. The minority of ten per cent. thinks not. In the absence of a showing of facts upon which to base the conclusion that the majority and the directors are not acting in good faith, I can see no justification for this court's interfering. It is a matter of business judgment and policy, and there is no occasion for this court to assume the role of arbiter upon the question of its advisability.

The restraining order will not issue.