**TOEBELMAN et al. v. MISSOURI–KANSAS PIPE LINE CO. et al.**

**No. 129.**

District Court, D. Delaware.

Oct. 13, 1941.

Julius M. Rosenfield (of Rothbart & Rosenfield), of Chicago, Ill., and John J. Morris, Jr., and Harold B. Howard (of Hering, Morris, James & Hitchens), both of Wilmington, Del., for plaintiff Lorena W. Toebelman, and others.

Robert Burnett (of Burnett, Stern & Liberman), of St. Louis, Mo., and Herbert L. Cohen, of Wilmington, Del., for intervenor Charles W. Hahn.

Arthur G. Logan (of Logan & Duffy), of Wilmington, Del., for defendants.

KIRKPATRICK, District Judge.

This is a stockholders' derivative suit against the directors of the defendant corporation, for misfeasance. The principal prayer is for an accounting of funds alleged to have been improperly spent. The corporation is a holding company with some 2,400,000 shares of stock outstanding, of which the plaintiffs and the intervenors together own 4,695 shares, or about one fifth of one per cent.

The defendants have moved for summary judgment. Supporting affidavits were filed and the matter has been fully argued. After the hearing I entered judgment in favor of the defendants as to all the causes of action stated in the complaint, except the one set forth in paragraphs 8, 9, 16 to 22, both inclusive, 31 and 35. These paragraphs deal with excessive expenditures. Fraud is charged adverbially, the allegations in that respect being to the effect that certain disbursements were "fraudulently exorbitant and fraudulently in excess of" the reasonable value of the services for which the payments were made, and the like.

Although at the time of the hearing I felt that the undisputed facts as shown by the affidavits strongly indicated that the plaintiffs had not and could not meet the burden of proof necessary to support this

last cause of action, I was moved to withhold the entry of summary judgment as to it by two considerations:

First: Mokan was a holding corporation, and the amount of its operating expenses seemed exceptionally large for such a company, and,

Second: An item of $571,851.70, $549,050.95 of which appears in the two annual reports to stockholders and the balance on the books for the three months following the date of the last report, all charged to reserve for legal and other expenses, did not seem to me to have been explained with the explicitness with which it could have been. I thought it possible that there might be some merit in the plaintiff's charge that the method of bookkeeping with respect to these items was intentionally misleading.

Until these two matters were more fully developed, I did not feel sufficiently informed to pass upon the motion for summary judgment. To meet this thought, the parties agreed that the Court should appoint an independent certified public accountant as examiner, who would have full access to all the books and records of the corporation and of the defendants, and that his report should be filed in affidavit form and considered as an additional affidavit in the case, subject to his presenting himself for further examination by the parties.

All this has been done. The accountant's report, and the record of his examination have been filed as affidavits. He has advised me that the defendants afforded him every possible facility for the development of all the relevant facts, and that he received their fullest co-operation. It might also be said that earlier in the proceedings by permission of the defendants, the plaintiffs had an accounting firm of their own selection make an examination of the defendants' books and accounts. The result of this evidently was not satisfactory to the plaintiffs, but it does not appear that the accountants were refused access to the relevant books and records. I am satisfied that any reasonable discovery procedure which might now be awarded would develop very little, if anything, more than is contained in the accountant's report and supplemental affidavit.

Based on the undisputed facts appearing from all the affidavits, I am of the opinion that the plaintiffs have wholly failed to establish anything entitling them to proceed further in the case. There is no genuine issue as to any material facts, and I do not think that the defendant or its officers should be put to the expense and effort of defending a lawsuit as to which there can be but one outcome.

A conflict, however sharp, between the management of a corporation and a minority group, as to the wisdom or propriety of regularly authorized corporate expenditures does not constitute an issue of fact, at least not a "genuine" issue in the legal sense, because Courts have universally refused to undertake to resolve such disputes. Davis v. Louisville G. & E. Co., 16 Del.Ch. 157, 142 A. 654. Nor does it make any difference that one side embodies its views in a formal complaint and denounces the acts complained of as fraudulent. Nor that the situation disclosed is complicated. When the relevant facts have been fully disclosed, it is the duty of the Court to determine whether or not the suggestion of fraud has anything to support it. If not there is no genuine issue of fact. So on a motion for summary judgment, if the affidavits show that all challenged expenditures were duly authorized by the directors, and no fact is disclosed which tends to rebut the "presumption * * * that the directors * * * [were] actuated * * * by a bona fide regard for the interests of the corporation" Karasik v. Pacific Eastern Corporation, 21 Del.Ch. 81, 180 A. 604, 607, judgment should be entered.

Almost every fact contained in the affidavits is relevant, and in passing upon the question of the right of the defendants to summary judgment the Court must be familiar with all the facts which are presented to it. An attempt to present them in detail would be merely a restatement. The following, therefore, it will be understood, is only in the nature of a very general summary:

Mokan was chartered May 5, 1928. During the year 1929 it organized and acquired the entire capital stock of Panhandle Eastern Pipe Line Company, an operating company delivering natural gas from fields in Texas and Kansas to various points in the middle west.

In 1930 Mokan got into financial difficulties, and in order to preserve its existence it believed it necessary to and did enter into a contract with Columbia Oil and Gasoline Corporation, a subsidiary of Columbia Gas and Electric Corporation, a potential competitor. By this contract Columbia Oil became the owner of fifty per cent of the

stock of Panhandle Eastern, and shortly thereafter it also became the owner of all the Panhandle bonds.

This contract, made September 17, 1930, was the source of a vast amount of litigation, too complicated and extensive to be detailed here. At any rate, the situation in which Mokan had been compelled to place itself resulted in it going into equity receivership on March 18, 1932. This receivership continued until September 29, 1937, at which time, so far as anything relevant to this case is concerned, it was terminated and a new phase of corporate existence began.

The items of claim as to which I entered summary judgment had to do with matters arising prior to the final decree of the Court approving a reorganization and the acts of the receivers. The remaining part, which is now under consideration, has to do entirely with expenditures from September 29, 1937, until December 31, 1940. It covers four fiscal periods of the corporation, the first three of one year each and the last of three months. During the four fiscal periods the corporation received income amounting to $2,455,625.33, mainly dividends from Panhandle.

Of the amount so received by the company, $300,000 went to reduce a loan. The reorganized company started out with a bank indebtedness of $1,100,000, all of which arose from the payment of claims, allowances and expenses arising out of the receivership. This item was reduced to $800,000 by the payment referred to. I find nothing in the transactions relating to it which calls for comment, either in the method of dealing with it or of reporting what was done to the stockholders.

$671,546.74 went to the purchase by the company of 15,149 additional shares of the common stock of Panhandle, bringing its holdings in that company up to 42 per cent of that company. These expenditures were the result of an exercise of judgment by the board of directors. Not only do I find nothing to indicate it was improvident, but it is abundantly clear that it was for the benefit of and for the best interests of Mokan.

$327,457.96 was paid out in dividends by Mokan to its own stockholders.

The foregoing payments, as to which there can be no possible criticism, leave two items to be considered:

First, operating expenses of $651,755.88, and,

Second, the item of $571,851.70 referred to above, charged to "reserve for estimated legal and other expenses to be incurred in the prosecution and settlement of claims and other matters arising during or prior to receivership." The amounts that were transferred to this reserve came from the capital surplus account. While there is some difference of opinion among accountants as to the correctness and propriety of the method of bookkeeping, I find nothing to indicate that it was intended as a fraudulent concealment of payments. The essential fact, namely, that the company spent that much money in addition to its operating expenses during the periods in question, was never concealed, and the purposes for which that money was spent are now fully and completely disclosed.

Dealing first with the operating expenses. They are itemized on page 16 of Exhibit A to the examiner's original affidavit. The largest item is officers' salaries, which amount to $138,785.11. In view of the interests involved, the mere size of this figure is not in my judgment so large as to indicate bad faith or even a faulty exercise of judgment on the part of the board.

The next large item is $95,625.27, which is for interest on the book indebtedness, and is unassailable.

The third large item is $58,941.68 for legal fees and expenses. These items of expense are shown on page 5 of the examiner's supplemental affidavit.

It is not necessary to go into further detail with regard to the operating expenses. All the larger items in that category were paid in pursuance of proper authorization by the board of directors, or ratified by them after full disclosure. There is nothing in the affidavits which even suggests that the discretion of the board in that respect was not properly exercised in the interest of the corporation. In fact, the undisputed evidence of the corporate records is that it was.

Coming now to the "reserve for estimated legal and other expenses" above referred to. We begin with an item of $404,375.10 which was paid out from time to time for legal fees and expenses. Every one of these payments was properly authorized or ratified by the board of directors. There is nothing to show that the work for which the attorneys were paid was not done by them, that the amounts paid were unreasonable or excessive, or that these payments were diverted to cor-

porate officers or other persons not entitled to them. Roughly, the services were rendered in connection with five pieces of litigation in which Mokan was engaged during this entire period.

Approximately $250,000 was incurred in connection with its litigation with the Columbia Gas and Electric Corporation and its subsidiary, Columbia Oil and Gasoline Corporation. I am quite familiar with this litigation as certain phases of it were involved in two other suits, which were in part argued at the hearing in the present case. These cases have recently been settled, but, before that, I had given them very extended consideration. From what I have learned in this manner (and I am sure that I got a correct picture of it), I would not attempt to suggest that the amount of the fees was excessive. Indeed, every indication is that a detailed examination of just what counsel did, and how much time was spent would reveal that the amount of the fees was well within the discretion of the board of directors in authorizing payment. Such an audit could, of course, be ordered, but the expense and magnitude of the task are apparent, and the point raised by the motion for judgment now before the Court is whether a stockholder should be allowed to impose the burden upon the company, upon a showing which amounts to little more that an assertion that he is dissatisfied. See Haas v. Sinola Exploration and Development Co., 17 Del.Ch. 334, 155 A. 4.

$20,000, approximately, is chargeable to what has been referred to as the Mayo case, a somewhat difficult piece of litigation arising out of a suit brought by Mayo against the corporation based on loans made by him in his capacity as a trustee to the corporation, prior to the receivership.

$20,000 was chargeable to what is called the Cities Service case, $8,000 to the Parrish case, and $7,500 to the Warwick case. These last three suits were attempts by the corporation to recover very large amounts of money, as to which the judgment of the board of directors in paying the fees seems entirely justified by the facts disclosed.

I am of the opinion that the plaintiffs have failed to show anything justifying the interference of the Court in connection with the payment of this amount of $404,375.10 for legal fees and expenses.

The remaining items paid from and charged to reserve are the only ones about which there can be any possible question. $85,000 was paid to Brokaw, Dixon and Mc-Kee for an engineering survey and report on the physical properties and finances of the company. Brokaw, Dixon and McKee are a firm of consulting engineers of high standing and considered to be experts in the field in which they were engaged. They were authorized by resolution on August 17, 1937 (being the first meeting of the board of the reorganized corporation), to make the survey in question. It was completed on April 29, 1938, or a period of about eight months. Their report covers 354 pages and appears to be a work which could well be worth what it cost.

I believe it is entirely proper for me to say that, from my own first hand knowledge of the cost of similar surveys ordered by the Court in reorganization cases, the amount is not, on its face, such as to raise any suspicion. The only question in connection with it arises from the fact that prior to and during the receivership this same firm had charge of the original work of constructing a large part of Panhandle's pipe lines and plant. The receivers also retained this firm for additional engineering work during the receivership period, and the firm presented a bill to the receivers amounting to $60,000 in fees and about $5,000 in expenses. The Chancellor disallowed fees of $45,800 and practically the entire expense, so that they received in all about $14,500. Nothing but the most exhaustive audit and examination of the work done by this firm under the authorization of August 17, 1937, could possibly show whether there is anything in the plaintiffs' suggestion (amounting to little more than a mere suspicion) that the board took the method of ordering an examination and report as an underhand means of paying the engineering firm for the work for which the Chancellor had in part refused payment.

On the one hand, it is a fact that Mr. Dixon, a member of this firm of engineers, was also a member of the board of directors of the company. On the other hand is the fact that of the total of $85,000 paid to this firm, $19,216.44 was paid by the issuance of 40,000 shares of Class B capital stock of Mokan, at a little over 48 cents a share. It is not possible for me to state the exact value of this stock at the time of the issue, but other shares of the same class issued for services by Mokan at the same time to other parties were issued at 48 cents a share and within six months bought back by the company at 25 cents a share, or approximately 50% of the value at which they

were issued. If this value is applicable to the engineering fee, it would reduce the actual amount of it by some $9,000.

Undoubtedly this firm had in their possession much information which assisted them in making the report the charge for which is challenged as excessive. Just how much, it is impossible to say. There is no question but that the report was and is of great value to the company, that it involved a large amount of entirely new work, that it took a great deal of time to make it, and that it properly entitles the engineers to be paid, certainly, a very large part of their present bill, if not all. If it could be cut at all, it could not be cut by a very great amount, and the question of good faith in paying it would still remain.

In view of these facts I fail to find anything in the affidavits to indicate the board of directors abused the discretion vested in them by law, or acted in bad faith or contrary to the interests of the corporation in connection with the $85,000 payment to Brokaw, Dixon and McKee.

The other matters which call for consideration are certain payments to William G. Maguire, president of the company. These payments are included in five items:

First, ordinary travelling expenses amounting to $10,813.19 during the period of three years and three months under consideration. This is not an unreasonable amount, and there is nothing about it which requires the Court to audit it.

The next item is Mr. Maguire's salary as president of the company. This was at the rate of $25,000 for the first year and $30,000 thereafter for the remaining time. It is certainly not excessive and was duly authorized by the board.

The third item received by Maguire was $30,537.27, which represents expenses incurred by him from March 10, 1937, to August 17, 1937. This was during the period of the receivership and prior to the final reorganization of the company, but the services had a direct bearing upon the reorganization and the future policy of the enterprise. Maguire asserted that the company was legally liable to him for it. Before the board authorized payment they obtained independent legal opinions from three different firms of attorneys as to the legality of the claim and the propriety of recognizing it. I will not attempt to pass upon the legal enforceability of Maguire's claim. It is not within my province to do so. I find as a fact, however, that the board exercised a fully informed discretion, and in so doing was motivated by no improper purpose, but acted according to their best judgment for the interest of the company. There is nothing in the affidavits submitted from which an improper motive could be found, or to rebut the presumption of good faith.

The fourth item paid to Maquire is $29,854.23. The items charged to this account represent expenses incurred by Maquire in connection with the reorganization of the company, and were paid during the two year period ending September 30, 1939. This is a large figure, but when the nature of the service which Mr. Maquire was performing is considered, I cannot see that it is an excessive amount for expenses. If it is, the excess would be of such a small amount as to be de minimis, and would not be evidence of anything more than an error of judgment.

The final item in this group comprises distribution to Maquire of 20,066 shares of the common capital stock of Mokan, and the amount of the item in dollars is approximately $100,000. This transaction arose out of the settlement of litigation, arising from certain advances that were made to Mokan under an agreement dated August 3, 1931, in which Ralph B. Mayo acted as trustee for certain stockholders, and which has already been referred to, as the Mayo case. The settlement was made by the board after full consideration of all the facts, and after having received the opinions of two firms of attorneys to the effect that the settlement was advisable and proper. There was also a committee appointed by the board of directors to make a full study of the situation and report on the proposed settlement, which committee recommended effecting the settlement. The whole matter is disclosed in the contract of settlement which is before the Court. Again, the Court does not deem it to be its function to pass upon the advisability of the settlement, or the fairness of its terms. Obviously, to reach any intelligent conclusion on those points would require something very like trying the entire Mayo case, a wholly impracticable procedure.

All of the five items of payment to Maquire have been discussed, and of these, two items, the $30,537.27 for expenses from March 10, 1937, to August 17, 1937, and the $29,584.23, covering expenses incurred after the company was reorganized, were in-

cluded in and passed through the charge to reserve for estimated legal and other expenses of $571,851.70 which has been heretofore mentioned.

In order to avoid confusion, it may be mentioned that the books of the company show three different reserves: First, reserve for possible liability on unsettled claims arising prior to receivership, amount $113,136.53. As to this amount I find no challenge which requires discussion. Second, reserve for possible additional receivership expenses in the amount of $30,000. The same applies to this. Third, the reserve for estimated legal and other expense to be incurred in the prosecution and settlement of claims and other matters arising during or prior to receivership in the amount of $250,000, which was subsequently increased to $673,668.84. Out of this reserve the amount of $571,851.70 was paid out, and has been the subject of much of the foregoing discussion. The balance is still in the hands of the company.

■ The general legal principle involved is familiar. Citation of authorities is of limited value because the facts of each case differ so widely. Reference may be made to the statement of the rule in Helfman v. American Light & Traction Company, 121 N.J.Eq. 1, 187 A. 540, 550, in which the Court stated the law as follows: "In a purely business corporation * * * the authority of the directors in the conduct of the business of the corporation must be regarded as absolute when they act within the law, and the court is without authority to substitute its judgment for that of the directors."

These principles have been followed by the courts of Delaware, particularly in Davis v. Louisville Gas & Electric Co., supra [16 Del.Ch. 157, 142 A. 659], where the Court said: "We have * * * a conflict in view between the responsible managers of a corporation and an overwhelming majority of its stockholders on the one hand and a dissenting minority on the other—a conflict touching matters of business policy, such as has occasioned innumerable applications to courts to intervene and determine which of the two conflicting views should prevail. The response which courts make to such applications is that it is not their function to resolve for corporations questions of policy and business management. The directors are chosen to pass upon such questions and their judgment unless shown to be tainted with fraud is accepted as final. The judgment of the directors of corporations enjoys the benefit of a presumption that it was formed in good faith and was designed to promote the best interests of the corporation they serve. * * * In the absence of a showing of facts upon which to base the conclusion that the majority and the directors are not acting in good faith, I can see no justification in this court's interfering. It is a matter of business judgment and policy, and there is no occasion for this court to assume the role of arbiter upon the question of its advisability."

■ I am of the opinion that the defendants are entitled to summary judgment on the showing of undisputed facts made in the pleadings and affidavits.

■ The defendants also ask for judgment on the ground that the plaintiffs have failed to comply with Rule 23(b) of the Federal Rules of Civil Procedure, 28 U.S. C.A. following section 723c, which provides that the complaint shall set forth "the efforts of the plaintiff to secure from the managing directors or trustees and, if necessary, from the shareholders such action as he desires, and the reasons for his failure to obtain such action or the reasons for not making such effort." They concede that, inasmuch as all the directors are individual defendants, no demand upon them to sue themselves is necessary. The plaintiffs, on their part, concede that they have not made any effort to obtain action by the stockholders.

It appears that the present attorneys for the plaintiffs were engaged by them in 1938, and that since that time, and before this suit was begun, there have been two annual stockholders' meetings, in December, 1938, and December, 1939. Nothing was done by the plaintiffs at either of those meetings to bring the things of which they now complain to the attention of the body of shareholders.

Furthermore it seems clear that, if resort to the body of stockholders is a necessary prerequisite, there is nothing in the facts alleged by the plaintiffs which would excuse failure to make it. Paragraph 34 of the complaint states the substance of the plaintiffs' position in this respect. It is there averred that there are more than ten thousand shareholders of Mokan, that meetings of the shareholders are held infrequently, and are held in the State of Delaware, that many of the shareholders reside

340

at great distances from the place of meeting, and consequently few attend, "that the benefit of any relief sought herein would be greatly imperiled or lost completely if action were postponed until a shareholders' meeting were held; that, furthermore, since the shareholders of said Mokan are such a large and diversified group it would be impossible to secure any adequate relief through a shareholders' meeting." Coupled with this is a general allegation that the defendant Maguire controls and dominates the affairs of Mokan.

I understand it to be a conceded fact that Mr. Maguire and the group which might be expected to support him own not more than 10% of the outstanding voting stock of the corporation. I do not find any fact averred in the complaint or appearing in the affidavits from which it could be concluded either that the alleged domination of Maguire was so powerful that he could have prevented the body of stockholders from acting had a case of fraudulent diversion of corporate assets been presented to them, or that the plaintiffs' cause would have been irreparably injured by waiting until the stockholders' meeting, even that of December, 1939, before bringing suit.

However, I shall not place the entry of judgment in favor of the defendants upon the ground of the plaintiffs' failure to comply with Rule 23(b). I am not satisfied that the law of Delaware requires that an effort be made to obtain action from the stockholders where an application to the board of directors either has failed or would be perfectly useless. No decision of the Courts of Delaware so holding has been cited to me. The leading case seems to be Sohland v. Baker, 15 Del.Ch. 431, 141 A. 277, 58 A.L.R. 693. In the opinion, the Delaware Court cites and quotes from Hawes v. Oakland, 104 U.S. 450, 461, 26 L.Ed. 827, but the facts before it and its action, as I read the report, do not support the view that the Court intended to rule that application to the stockholders was required. Undoubtedly the rule in the federal courts does. In Hawes v. Oakland, the Court said, "If time permits, or has permitted, he must show, if he fails with the directors, that he has made an honest effort to obtain action by the stockholders as a body, in the matter of which he complains. And he must show a case, if this is not done, where it could not be done, or it was not reasonable to require it." And

the Delaware Court [15 Del.Ch. 431, 141 A. 282, 58 A.L.R. 693] quoted, as the rule, that the plaintiff "should show, to the satisfaction of the court, that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes." The later United States Supreme Court decisions of Doctor v. Harrington, 196 U.S. 579, 25 S.Ct. 355, 49 L.Ed. 606, and Delaware & Hudson Co. v. Albany & Susquehanna Railroad Company, 213 U.S. 435, 29 S.Ct. 540, 53 L.Ed. 862, do not overrule Hawes v. Oakland, but are examples of cases where the futility of appeal to the body of stockholders was apparent.

Judgment may be entered in favor of the defendants.