**TOEBELMAN et al. (HAHN, Intervener) v. MISSOURI–KANSAS PIPE LINE CO. et al.**

**No. 8002.**

Circuit Court of Appeals, Third Circuit.

Argued July 13, 1942.

Decided Oct. 16, 1942.

John J. Morris, Jr., of Wilmington, Del. (Rothbart & Rosenfield and J. M. Rosenfield, all of Chicago, Ill., and Harold B. Howard, of Wilmington, Del., on the brief), for plaintiffs-appellants.

Robert Burnett, of St. Louis, Mo. (Henry H. Stern and B. L. Liberman, both of St. Louis, Mo., and Herbert L. Cohen, of Wilmington, Del., on the brief), for intervening plaintiff-appellant.

Arthur G. Logan, of Wilmington, Del. (Logan & Duffy and H. Newton White, Jr., all of Wilmington, Del., on the brief), for defendants-appellees.

Before MARIS and GOODRICH, Circuit Judges, and SMITH, District Judge.

MARIS, Circuit Judge.

The plaintiffs, minority shareholders of Missouri-Kansas Pipe Line Company (hereinafter called Mokan), brought a stockholders' derivative suit in the District Court for the District of Delaware. An additional minority stockholder intervened upon the first cause of action alleged in

the complaint. Jurisdiction is based upon diversity of citizenship.

The defendants moved to strike or dismiss the complaint. The court denied this motion. The defendants then moved for summary judgment and filed affidavits in support of their motion. The plaintiffs moved for leave to inspect certain designated books and records of Mokan under Civil Procedure Rule 34, 28 U.S.C.A. following section 723c. Later the plaintiffs amended their motion and prayed that the motion for summary judgment be denied or in the alternative that a continuance be granted to permit the plaintiffs to obtain affidavits and take depositions of the defendants Maguire and Tringham and of Mokan's attorneys Logan and Hand and have discovery as provided by Civil Procedure Rule 56(f). The court denied the plaintiffs' motion but, with the consent of the parties, appointed an accountant to examine Mokan's books and records and to file the results of his examination in the form of an affidavit. After the examiner's report was filed the court entered summary judgment and dismissed the suit without a trial for the reasons set forth in its opinion. 41 F.Supp. 334.

It is now well settled that summary judgment may be entered for either party if the pleadings, depositions, admissions on file and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Civil Procedure Rule 56. Stated conversely, a substantial dispute as to a material fact forecloses summary judgment. McElwain v. Wickwire Spencer Steel Co., 2 Cir., 1942, 126 F.2d 210; Miller v. Miller, 1941, 74 App.D.C. 216, 122 F.2d 209; Whitaker v. Coleman, 5 Cir., 1940, 115 F.2d 305. Upon a motion for a summary judgment it is no part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried. Ramsouer v. Midland Valley R. Co., D.C.Ark., 1942, 44 F.Supp. 523. All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment. Weisser v. Mursam Shoe Corporation, 2 Cir., 1942, 127 F.2d 344.

In their bill of complaint the plaintiffs set forth five separate causes of action which they alleged Mokan had against the individual defendants. The court entered summary judgment for the defendants upon all five causes of action. Upon appeal the plaintiffs have tacitly abandoned two of the causes of action by restricting their arguments to the remaining three. We accordingly restrict our consideration to these three causes of action. As to each of them the same question must be asked—was there a substantial dispute as to a material fact, which, if resolved in favor of the plaintiffs, would entitle Mokan to recover from the defendants. Upon two of these causes of action we think the reply must be in the negative and that the entry of summary judgment thereon was proper. This is true as to the claim that the defendant Maguire received double commissions in 1930 without the knowledge of Mokan. The records clearly disclose that Mokan knew of the double commissions, that the commissions were not for the same services and that two courts of competent jurisdiction passed upon the matter adversely to the plaintiffs' present claim. This leaves no material fact for relitigation. The same is true as to the amount of the commissions paid to Maguire for his 1930 services. Those amounts were arrived at by settlement and arbitration. There is absolutely nothing in the record to sustain the plaintiffs' claim that the settlement was coerced or the arbitration fraudulent. Nor is there any genuine issue as to a material fact involved in the claim that in March, 1938, Maguire procured the issuance to W. E. Maguire & Company of certificates for 19,000 shares of Mokan stock upon an affidavit that the originals had been misappropriated, stolen, lost or destroyed, which affidavit was knowingly false, and that Maguire used his position of domination and control of Mokan to cause Mokan to enter into an agreement to indemnify the transfer agent against any loss connected with the transfer. The affidavit of Maguire is to the effect that 14,000 of the original shares have been cancelled and that certificates for 5,000 of the new shares are on deposit with the secretary of Mokan pending a suit by the holder of the original shares under an agreement by Maguire to cancel the new shares if he loses that suit. It would, therefore, appear that no possible damage can be sustained by Mokan as a result of the issuance of the 19,000 new shares, and that there is nothing left to try as to this cause of action.

This brings us to the remaining cause of action to which all parties refer as the

accounting phase. The plaintiffs allege that Mokan is a holding company having no business activities other than to vote shares of stock which it owns in two operating companies (Panhandle Eastern Pipe Line Company and Kentucky Natural Gas Company) and receive dividends thereon; that the defendant Maguire dominated and controlled Mokan and its board of directors during the fiscal years 1938 and 1939; that the defendants have wasted and expended over $250,000 for administrative expenses of Mokan during 1938 and 1939 and for the same period $423,668.84 which is unitemized in the annual report to stockholders but referred to as having been "incurred and charged during the fiscal year to the reserve for legal and other expenses to be incurred in the prosecution and settlement of claims and other matters arising during or prior to receivership"; that grossly excessive payments for and in the guise of administrative expenses, salaries and legal and engineering expenses consumed the bulk of dividends of $1,216,222.50 received by Mokan on its Panhandle stock; that the defendants, in an attempt to conceal the extent of those expenditures set up a so-called "reserve for legal and other expenses incurred in the prosecution and settlement of claims or other matters arising during or prior to receivership"; that said reserve account was set up October 27, 1938 retroactively to September 30, 1937; that no disclosure was made to shareholders as to the disbursements which were charged to this account; that Mokan issued 25,244 shares of $5 par common stock and 97,879 shares of $1 par common stock during 1939 without consideration; and that Mokan has paid no dividends. The plaintiffs seek discovery and an accounting from the defendants for all of the sums alleged to have been wasted and dissipated.

The defendants filed no answer to this cause of action, but, as previously stated, moved for summary judgment in their favor upon it. The defendant Tringham filed an affidavit and exhibits in support of the defendants' motion for summary judgment upon this cause of action. He recited therein that Mokan had been in receivership, that several matters had arisen prior to and during the receivership which required the employment of counsel, that upon the partial termination of the receivership Mokan assumed the conduct of these matters, specifically, the defense of a claim by Mayo for 54,000 shares of Mokan stock and of a claim for expenses of an ancillary receivership in Illinois, the prosecution of anti-trust cases against Cities Service Company, Columbia Gas, Columbia Oil, a claim against Frank P. Parish for mismanagement of Mokan prior to receivership and an action against Hillman Land Company; that 50% of the dividends received from Panhandle was applied to the repayment of a debt of $1,100,000 which has been paid in full; that the reserve account was set up upon recommendation of two auditing firms, adopted by the board of directors and approved at stockholders' meetings and was not intended to and did not conceal any expenses or disbursements; that the expenditures for legal and other expenses charged to reserve, were in all cases approved by the board of directors and by the stockholders at the annual meetings, of which notice was given to all stockholders; that the same is true of the administrative expenses; that the activity of Mokan's officers and attorneys caused an increase in Panhandle's earnings; that the management of Mokan has struggled to free Panhandle from the Columbia Gas system; that 105,000 shares of stock were paid by Mokan for services and 39,066 shares were transferred to Mayo, as trustee, in settlement of his suit for 54,000 shares, the settlement having been made on advice of counsel and approved by the board of directors and the stockholders; that the attorney for the plaintiffs was given such information as he requested; that neither the plaintiffs nor intervening plaintiff appeared at the annual stockholders' meeting of 1939; that neither the plaintiffs nor the intervening plaintiff raised any question with respect to the balance sheets and reports mailed to the stockholders for 1938 and 1939 at either of the annual meetings nor did they demand at these meetings that Mokan bring an action based upon the causes alleged in the bill.

The plaintiffs sought by their motions for discovery under Civil Procedure Rules 34 and 56(f) to secure the court's consent to make an examination of Mokan's books and records and an examination under oath of Maguire, Tringham, Hand and Logan, because of their familiarity with the various expenditures. The court deemed the discovery method inadvisable. In lieu thereof it appointed Harry Margolis, an accountant, to examine Mokan's books and records. The Margolis report covers the period between October 1, 1937 and De-

cember 31, 1940. For that period Mokan's gross receipts were $2,455,625.33, its operating expenses $651,755.88 and amounts charged to reserve for legal and other expenses $571,851.70. The total expenses of $1,223,607.58 for that period represented 49.83% of the gross receipts, but $1,232,017.75 net income remaining. Out of this net income Mokan paid $671,546.74 for the purchase of 15,149 shares of common capital stock of Panhandle Eastern Pipe Line Company. For the fiscal years 1938 and 1939, the period covered by the bill of complaint, the gross receipts were $1,234,987.53, the operating expenses $346,751.69, and amounts charged to reserve $423,668.84 making a total of $770,420.53 disbursed for administrative, legal and other fees and expenses. The report contains a summary of Mokan's corporate organization and history, a summary of the disposition of the funds from 1937 to 1940, of dividends received and paid, officers' salaries, rental, receivership reserves, treasury stock distributions, and settlement covering expenses paid by Maguire prior to reorganization, comments on the Tringham affidavit, a comparative analysis of income and expenses, a summary of charges to reserve for estimated legal and other expenses, an analysis of outstanding capital stock, an analysis of capital surplus and an analysis of earned surplus.

We think that even after the Tringham affidavit and the Margolis report a number of questions of fact, most material to the ultimate right of recovery, remained unanswered. Without attempting to be exhaustive we shall refer to a few of these in order to indicate the basis for our conclusion that the plaintiffs are entitled to proceed further with their cause of action for an accounting.

■ *Purchase of Panhandle Stock by Mokan.* Mokan purchased 15,149 additional shares of common capital stock of Panhandle Eastern Pipe Line Company for $671,546.74, or an average cost of $44.32 per share during the fiscal years 1939 and 1940. Of these 11,888 shares were purchased in the fiscal year 1939 at a cost of $531,109.29 or an average of $44.67 per share. The minutes of the corporation disclose that the defendants Tringham and Maguire were authorized to exercise 15,000 warrants to subscribe to Panhandle common stock at $25 per share. Referring to the purchase of this stock the dis-

trict court said "$671,546.74 went to the purchase by the company of 15,149 additional shares of the common stock of Panhandle, bringing its holdings in that company up to 42 per cent of that company. These expenditures were the result of an exercise of judgment by the board of directors. Not only do I find nothing to indicate it was improvident but it is abundantly clear that it was for the benefit of and for the best interests of Mokan." It does not appear how the court reached the conclusion that the board exercised its judgment as to the purchase of the stock in the absence of a resolution by the board authorizing the purchase. Nor does it appear upon what basis the court concluded that the payment of $44 per share was justified by an authorization to exercise warrants at $25 per share. The allegations of the plaintiffs that the over the counter sales during 1939 reached a high of 46 and a low of 34-3/4, or an average of less than $41 per share, raise a material issue of fact. It is clear that there is a substantial dispute of fact as to whether the purchase was authorized at the prices actually paid.

■ *Columbia Gas Case.* The plaintiffs claim that the individual defendants, especially Maguire, transformed Mokan from a holding company whose sole business was to vote stock which it owned in two operating companies and to collect dividends therefrom to a company whose sole business seemed to be litigation which resulted in the misuse and waste of the corporate assets. It cost Mokan $251,117.36 in fees and expenses for the prosecution of cases seeking to divest the Columbia Gas system of its interest in Panhandle for the period from October 1, 1937 to December 31, 1940. The plaintiffs contend that this object could be and was accomplished by Government agencies and not by Mokan and its attorneys. The district court called upon its knowledge gained from other cases as to the complicated problems involved in the divestiture proceedings. We think the plaintiffs should be permitted to prove their contention. In any event it was improper to base a summary judgment in part upon the district judge's personal knowledge and reactions to matters appearing in other cases with which he has had some familiarity, being matters not appearing in the pleadings, depositions, admissions and affidavits presented by the parties.

*Payments to Maguire.* The plaintiffs allege that Maguire dominated Mokan, its directors and officers,. for his own ends and that he mulcted Mokan of its assets. The Margolis report shows that Maguire received the following amounts from Mokan during the years in question:

Salary—1938 ................ $ 25,000.00
Salary—1939 ................ 30,000.00
Expenses 1938 .............. 13,995.36
(Charged to reserve account)
Proxy fight expenses 1937.... 30,537.27
(Charged to reserve account)
Expenses 1939 .............. 14,888.87
(Charged to reserve account)
Expenses 1939 .............. 1,000.00
(Charged to reserve account)
Travelling expenses (not dated) ...................... 10,813.19
Mayo settlement—20,066 shares common delivered to Maguire's company .......... 100,330.00

An independent investigation of the books of Mokan and an examination of the defendant Maguire might serve to answer many questions which arise upon a perusal of the above items. Remembering that Mokan is a holding company with a minimum of operating problems the salary received by Maguire may well have been exorbitant.[1] Other questions seem to require answer. What is blanketed under the general item "expenses"? Why did Maguire, paying none of the fees and expenses involved in the Mayo litigation (all of which were paid by Mokan) and not openly appearing in that litigation, receive shares upon the settlement having a par value of over $100,000.00? The Margolis report makes special note of the failure of the Tringham affidavit to reveal the fact that out of the 39,066 shares delivered in settlement of the Mayo claim 20,066 shares were delivered to a com-pany substantially owned by Maguire. He states "Under the caption designated 'Stock Changes' on page 12 of the (Tringham) affidavit, it will be noted that, 'An additional amount of stock totaling 39,066 shares of Common Capital Stock of the company was transferred in connection with a settlement made with Ralph B. Mayo as trustee. Said amount of stock was transferred to the said Ralph B. Mayo, as trustee, in settlement of an action he brought against the corporation in the Court of Chancery of the State of Delaware in and for New Castle County wherein he claimed 54,000 shares of Common Stock'. The affidavit has appended Schedule B, reflecting the authorization of this settlement by the Board of Directors and counsel, and this statement fails to indicate that W. G. Maguire and Company, Incorporated (substantially owned by W. G. Maguire, president and director of the Missouri-Kansas Pipe Line Company) received 20,066 shares of the Common Stock issued to Ralph B. Mayo, in settlement of this litigation, with aggregate par value in excess of $100,000.00." We think it bears directly upon the plaintiffs' charge that Maguire was responsible for the waste and misuse of Mokan's assets to determine why Maguire's firm received these shares and why that fact was sought to be concealed.

*Development Charge Off.* Under this heading Mokan paid to

W. G. Maguire................ $ 1,500.00
Brokaw, Dixon & McKee...... 1,955.88
R. B. Hand .................. 27,721.35
F. H. Robinson............... 705.65
S. P. Curtis................. 250.00

$32,132.88

It is a fair question to ask just what expenses could properly be incurred for the

---

[1] On the question of the effect of salaries so large as to amount to spoliation Justice Butler said in Rogers v. Hill, 289 U.S. 582, 591, 592, 53 S.Ct. 731, 735, 77 L.Ed. 1385, 88 A.L.R. 744: "While the amounts produced by the application of the prescribed percentages give rise to no inference of actual or constructive fraud, the payments under the by-law have by reason of increase of profits become so large as to warrant investigation in equity in the interest of the company. Much weight is to be given to the action of the stockholders, and the by-law is supported by the presumption of regularity and continuity. But the rule prescribed by it cannot, against the protest of a shareholder, be used to justify payments of sums as salaries so large as in substance and effect to amount to spoliation or waste of corporate property. The dissenting opinion of Judge Swan indicates the applicable rule : 'If a bonus payment has no relation to the value of services for which it is given, it is in reality a gift in part, and the majority stockholders have no power to give away corporate property against the protest of the minority.' [Id., 2 Cir.], 60 F.2d 109, 113."

development of a holding company such as Mokan.

We think the foregoing illustrations are sufficient to make clear that there actually were a number of disputes as to facts material to the determination of the ultimate question whether Mokan has any right to an accounting and recovery against the individual defendants for the waste of Mokan's assets.

The defendants argue that the plaintiffs may not raise the issue as to the defendants' alleged fraudulent mismanagement of Mokan's affairs during 1938 and 1939 because all their acts as directors were ratified by a majority of the stockholders at the annual stockholders' meetings. Ratification to be effective imports knowledge of all material facts on the part of those ratifying. First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co., 8 Cir., 1938, 98 F.2d 416, 427, certiorari denied Phoenix Finance Corp. v. Iowa-Wisconsin Bridge Co., 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420. The affidavit of Rosenfield, attorney for the plaintiffs, specifically denies that the stockholders had notice that any of the matters set forth in the complaint would be discussed or that a blanket resolution to ratify all activities of the directors for the prior year would be voted upon and also denies that the stockholders had knowledge of the circumstances surrounding the acts to be ratified. Moreover a majority of the stockholders cannot sanction a fraudulent misappropriation or misapplication of the corporation's funds. Continental Securities Co. v. Belmont, 206 N.Y. 7, 17, 99 N.E. 138, 51 L.R.A.,N.S., 112, Ann.Cas. 1914A, 777. It is settled law in Delaware that if the acts are ultra vires, illegal or fraudulent they may not be ratified. Keenan v. Eshleman, Del.Ch.1938, 2 A.2d 904, 909, 120 A.L.R. 227. A purported ratification is negatived if the acts of which complaint is made are fraudulent.[2] Nor can it fairly be held that because the plaintiffs and the intervening plaintiff did nothing at the 1938 and 1939 stockholders' meetings to prevent adoption of resolutions approving the acts of the board of directors they are precluded from ever bringing suit. The record discloses that the plaintiffs were persistently seeking information as to the expenditures made by Mokan and it was only after they abandoned hope of procuring an explanation satisfactory to them that they brought suit.

We accordingly conclude that the district court erred in entering summary judgment for the defendants as to the accounting cause of action. The case must, therefore, go back for further proceedings as to this cause of action in order to afford the plaintiffs an opportunity to produce evidence of the facts necessary to support the relief for which they ask. It is obvious that this evidence must come largely from the defendants. This case illustrates the danger of founding a judgment in favor of one party upon his own version of facts within his sole knowledge as set forth in affidavits prepared ex parte. Cross-examination of the party and a reasonable examination of his records by the other party frequently bring forth further facts which place a very different light upon the picture. The plaintiffs should, therefore, be given a reasonable opportunity, under proper safeguards, to take the depositions and have the discovery which they seek. Under this procedure all the issues involved in the accounting cause of action will be open for further proof and determination.

The judgment of the district court is reversed in so far as it denies the prayers of the complaint for discovery, accounting and other relief in respect of the cause of action alleged in paragraphs 8, 9, 16 to 22, both inclusive, 31 and 35, of the complaint, and this cause of action is remanded for further proceedings consistent with this opinion. In respect of the other causes of action alleged in the complaint the judgment of the district court is affirmed.

[2] See note in 6 U. of Chi. L. Rev. 269—Necessity of Application to Shareholders in Derivative Suits.