CHARLES W. DEMPSTER

*v.*

THE ROSEHILL CEMETERY COMPANY *et al.*

*Opinion filed December 16, 1903.*

1. CORPORATIONS—*what does not entitle stockholders to a re-issue of stock.* If a stockholder, at the request of other stockholders, pledges his individual stock to obtain money for the corporation, and such stock is lost through failure of the corporation to pay, he is not entitled to other stock of the same value and amount, but stands as a creditor of the corporation to the amount advanced.

2. SAME—*when new certificate will not be issued on theory of lost stock.* In an action by the assignee of a stockholder to compel the issue of a certificate for certain shares of stock alleged to have been lost, if the record shows the stockholder had received more shares than he was entitled to under the resolution of the board dividing the stock, a court of equity will not compel the issue of a new certificate except upon clear proof that the stockholder had not received the benefit of all the stock he was entitled to receive.

3. LACHES—*when relief is barred by laches.* A delay of forty years, until the last person familiar with the facts is dead, before the filing of a bill to compel the issue of a new certificate of stock in a corporation upon the theory of lost stock, will bar relief.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. PHILIP STEIN, Judge, presiding.

CANNON & POAGE, and HARVEY LANTZ, for appellant.

EDWIN BURRITT SMITH, ROBERT F. PETTIBONE, and WILLIAM S. FREEMAN, for appellees.

Mr. JUSTICE RICKS delivered the opinion of the court:

This is an appeal from a judgment of the Appellate Court for the First District affirming a decree of the superior court of Cook county, wherein appellant was complainant and appellees were defendants. Appellant filed his bill as assignee of one Andrew T. Sherman to the latter's interest in certain stock issued and not issued in

the appellee cemetery company, asking that the appellee company and certain of its officers be required to issue to him twelve and one-half shares of the original capital stock of said company, the allegation being, in substance, that at the organization of the company said Sherman was entitled to one hundred and fifty shares, of the par value of $15,000, of the capital stock, and that of such number of shares six and one-half had never been issued to him, and that other six shares of said stock had been issued to him and the certificate of stock so held by him had been lost. Appellant claimed as assignee under a general assignment of all of Sherman's interest in the stock of said corporation, and sought to have the original certificate issued for the six and one-half shares for which no certificate had ever issued, and a re-issue of the certificate of six shares the certificate of which is alleged to have been lost.

Appellees, by their answer to the bill, raised five defenses, viz.: (1) That the company has already issued to Sherman, complainant's assignor, more stock than he is entitled to; (2) *res judicata;* (3) *laches;* (4) champerty; (5) that complainant, Dempster, acquired said claim as the agent of and in trust for the appellee company.

The master to whom the cause was referred found in his report that three of the defenses set up, viz., (1) the over-issue of stock to Sherman, (2) *laches,* and (3) the agency of Dempster in the purchase of the claim for appellee company, were established, but that the other two defenses, viz., *res judicata* and champerty, were not established. Objections were filed to the master's report by appellant (appellees filing no objections) and were overruled by the master, and upon exception to the report before the court were again overruled by the chancellor and the report of the master confirmed and complainant's bill dismissed for want of equity.

The Rosehill Cemetery Company was incorporated by special act of the legislature of Illinois in 1859, with a

capital stock of $150,000. By resolution of its board of managers, adopted November 2, 1859, the entire capital stock was apportioned between three persons, as follows: To Francis H. Benson $115,000, to James V. Z. Blaney $20,000, and to Andrew T. Sherman $15,000, the shares of stock being each $100. Francis H. Benson was the original promoter and organizer of the corporation, and in fact was the owner of the entire capital stock of the company, having transferred to said company his equity in certain lands to be used by the company for cemetery purposes and receiving said stock in consideration therefor, and it was through said Benson that the shares of stock were respectively ordered to be issued to Blaney and Sherman. This suit was begun on the 19th day of October, 1899, lacking but a few days of forty years from the time of the order or resolution directing the issuance of the stock to the three persons above named. Many witnesses were examined and many exhibits introduced in evidence. The cause was referred to the master to take the proofs and report his findings. Much oral and documentary evidence was introduced, and the record is very voluminous, containing approximately 1300 pages, and covering the period of time from 1859 to the filing of the bill. Upon every material point there is a strong conflict of evidence. By reason of the lapse of time the memories of men have failed; death has intervened; records and accounts that, when inspected by those who made them, could have been understood and readily explained from the current history contained in them, have by flight of time and the death of those acquainted with the details, from the barrenness of their statements and the imperfect manner in which they were kept, become of doubtful value and uncertain indices of the transactions they were intended to preserve. With such a record and under such circumstances we do not feel called upon to go into an extensive review of the evidence, and must content ourselves with the expres-

sion of the views and conclusions reached, upon the material points, from a careful and thoughtful review of the evidence.

The decree was grounded upon three propositions: *First,* (*a*) that the stock to which Sherman, the assignor of appellant, under the original resolution was entitled had been fully issued; (*b*) that the stock that had been issued, the certificate of which it was alleged was lost and for which another certificate was sought, was not sufficiently shown to have remained in Sherman, the assignor; in other words, that from the whole evidence the conclusion was reasonable that the six shares, of which it was claimed the certificate was lost, had either been assigned by Sherman or surrendered to the company for indebtedness from him to it; *secondly,* that appellant was barred from relief by the *laches* of his assignor; and *thirdly,* that appellant had purchased the claim of Sherman as the agent of the Rosehill Cemetery Company, and ·hence held it as trustee, and could not be allowed, in equity, to assert his individual claim to the stock.

There is no controversy about the right of Sherman originally to have had one hundred and fifty shares of this stock, and it is further shown, without dispute, that outside of the stock to which he was entitled under the resolution he purchased one certificate of five shares that was issued to one of the other stockholders. In relation to the stock for which it is claimed no certificate was ever issued, the conclusions must be drawn from general facts. The master found that there had been, in fact, issued to Sherman shares to the value of $20,630, including the $500 that it is practically conceded was stock really belonging to Benson and by Benson assigned to Sherman, and deducting from this amount of stock $15,000 in value to which Sherman was entitled, and it would appear that there was $5130 more stock issued to him than was his right under the resolution through which he claims. Appellant contends, however, that the master is in error

in the conclusion reached as to the amount of stock that was issued to Sherman, and insists that the evidence shows that $4100 of the stock that was issued and with which he is charged was not the individual stock of Sherman, but was issued to him for the benefit of the company, and that he might hypothecate or pledge the same for a loan of $1000, which it is claimed was made through John L. Beveridge, who executed his note and pledged the stock to Dr. Banks for the money.

This same contention was made before the master and chancellor, and upon it they held adversely to appellant. The record shows that this stock was issued to Sherman in August and September, 1859, and the loan obtained by Beveridge upon the stock was not until the year 1861,— about the time he was going into the army. He testifies that he paid the loan after he returned from the army, and the stock was given to him by Benson, who was one of the principal stockholders, for having paid the loan, and he afterwards sold it back to the company for five or ten cents on the dollar. The stock was in three certificates, numbered 63, 65 and 66, respectively. No. 63 was for thirty shares and No. 65 was for five shares, and they were assigned on the 23d day of August, 1859, to Banks. No. 66 was for six shares, and was assigned the 8th day of September, 1859, to Ferguson, and the record shows that afterwards these shares were, upon the order of Banks and Ferguson, issued or re-issued in the name of Beveridge. There is no order or resolution shown authorizing or recognizing the authority of Sherman to procure a loan upon this stock for the benefit of the corporation. The corporation, as a matter of fact, had no stock upon which it could secure a loan. There was no treasury stock held in reserve for purposes of procuring loans, nor was there any unsubscribed stock. If the proceedings of that corporation were regular, every share that was issued belonged to Benson, Blaney or Sherman, and if Sherman saw fit, at the request of Blaney or his

co-stockholders, to pledge the stock that was his individual property for the purpose of obtaining money for the benefit of the corporation, and that stock should, in the operation, be lost because of the failure of the company to pay, Sherman would not thereby be entitled to other stock of the same value and to the same amount, but would stand as a creditor of the company to the amount of the sum advanced to it; and as the stock, when issued, was regularly charged upon the books of the company to Sherman, we are satisfied with the conclusion of the master and chancellor holding that this theory of a loan for the benefit of the company cannot operate so as to relieve Sherman's account from the charge of so much of the capital stock of the company as is shown by those certificates. In addition to that, the record shows that along about the time of the organization of this company Sherman was conducting a banking business, and that for the convenience of issuing stock, which was then of little value, the président and secretary signed the stock certificates in blank and left them at the bank of Sherman. Sherman failed in business. He had transactions with a certain bank designated as the Bank of Waupun, of Wisconsin, and was indebted to it. It is shown by both his bank ledger for 1859 and his admissions that $1500 of the stock of this company was pledged to the bank for his indebtedness to it. During the time within which these transactions were taking place, and covering the period during which the stock was issued to Sherman, he was the secretary of the company, kept its journals and was entirely familiar with every detail of its proceedings. If transactions that on their face value amounted to thousands of dollars were going upon the books of the association against him individually, when, in fact, the transactions were for some other member of the company or for the benefit of the company itself, it would seem that he would have looked to it that the books so showed.

From about the year 1860 to 1896 this company was in the hands of its creditors and bondholders who had gotten control of the majority of the stock, and the original organizers of it were practically debarred from any connection with it.  In 1882 a suit was brought by the minority stockholders to restore the company to the stockholders and redeem its property from the encumbrances upon it.  Sherman was active in that proceeding. His children and family, to whom he had assigned stocks, were materially interested.  The case reached a point, in 1885, when evidence was taken, and Sherman then testified that he no longer held any of the $15,000 of scrip that was awarded to him by the board in 1859; that he was entitled to one share, if he knew where it was, but that he did not know.  He then proceeded to show where and to whom he had assigned the stock issued to him. It did not occur to him then that there were six and one-half shares of the stock that had never been issued to him, and he did not so state, and while it may be true that the evidence touching this matter is not as plain and conclusive as it might be, still we think, in view of the length of time intervening between these transactions and the time this attempted account of them is being made, and considering the vicissitudes of all those actually concerned in the organization of the company and of the company itself during this period, it is as satisfactory as courts may ordinarily expect to find in such transactions.  The books of the company show clearly that there was more stock issued to Sherman than he was entitled to have.  He has not, as we think, made such explanation as relieves his account from the charges as found in the books, and the contention of counsel for appellant that it is the duty of appellees to explain the transactions as appear from the books is not tenable. Appellant is insisting upon certain relief covered by the status of Sherman's account with this company, and to entitle him to that relief the burden rests upon him.

The records of the cemetery company show that on or about the 21st of December, 1859, there had been issued to Sherman certificates numbered 45, 46, 48, 49, 50 and 51, of one share each, of the stock of said company, and it is now strenuously urged by the learned counsel for appellant that the record clearly shows that these shares of stock were lost, and that appellant, as assignee of Sherman, was entitled to have a re-issue of these certificates. In 1881 or 1882, when Sherman was engaged in forming the syndicate to prosecute the suit of *Higgins* v. *Lansingh*, 154 Ill. 301, which was for the express purpose of establishing the rights of the stockholders in said company, he, with other members of the syndicate, executed a written contract, in which was set out the extent of stock interests of the various members of the syndicate, and in that contract Sherman stated that he was the owner of $500 of stock, par value, under certificate No. 41. Sherman was a witness in that case, and with reference to his holdings of stock testified: "I no longer hold any of this $15,000 of scrip that was awarded me by the board November 2, 1859. I am entitled to one share of $100 if I knew where it was, but I don't know where it is." The witness then continued to detail where he had disposed of the stock, and among the dispositions was $1500 that was surrendered to the company and canceled to pay a dividend upon the stock held by him. As a matter of fact, the dividend that he paid was $1280 and was paid in stock, but the number of the certificates of stock thus used is not shown. It also appears that $1500 of the stock was turned over by him to the Waupun Bank, and the number of the certificates of these shares does not appear. Upon the present trial, touching the certificates now contended for, Sherman testified: "The stock at first was not worth a great deal. I was careless of my stock, and the certificate I held by some means got into the rag-bag, and my wife was selling rags, and in taking them up I discovered some of these certificates.

Nos. 45, 46, 50 and 51 I never found. My mind has never been clear about certificate No. 48. I don't remember whether I lost it or not. I never sold it, to the best of my recollection."

It appears clearly from the record that stock was issued to Sherman largely in excess of the stock to which he was entitled under the resolution of the board. This is a proceeding in equity, and though it might appear that these shares had been issued to Sherman and had been assigned by him, yet before his assignee would be entitled to have certificates for those shares issued upon the theory of lost stock, it would be incumbent upon appellant to make the same showing that Sherman would be required to make if he were complainant in the bill, and we apprehend that with the record showing that he already had shares to the extent of $5000 more than he was entitled to, a court of equity would not require an additional six shares to be issued to him by the company except upon clear proof that the shares in excess of the number to which he was entitled were not in fulfillment of his rights under the resolution, but were by some other arrangement between him and the other holders of stock in the company. In other words, it must affirmatively appear that Sherman has not received the benefit of all the stock to which he is entitled under that resolution. With the certificates assigned to the company in payment of its demand of $1200, no record of the certificates of which was kept, and the fifteen shares that were sold or delivered to the Waupun Bank with no record of their certificate number, we are unable to see how the court could reach the conclusion that appellant had shown, by a clear preponderance of the evidence, that he, as the assignor of Sherman, was entitled to have a re-issue of any stock.

Much stress is laid by appellant upon certain memoranda made by the experts, Vercoe and Furber, who, it appears, went over the books of the company after the

termination of the Lansingh and Higgins suit with a view of straightening out its list of stockholders. In the list made by them, certificates Nos. 45, 46, 49, 50 and 51 were listed as standing in the name of Sherman, and it purports to be founded upon the decree in the *Higgins case.* The minute was made in accordance with the finding of the master, but exceptions were filed to the report of the master in that case upon the point relating to the certificates and others, and while the court overruled the exceptions it expressly declared that "the parties claiming under them are not entitled to any right by reason of the finding of the master concerning such certificates; nor shall any other party in interest be prejudiced by such finding of the master, and all parties are left as free to contest any claim made on such certificates of interest * * * as though no such finding had been made." As a matter of fact that question was not before the master, and the court declined to decree anything in regard to it. The evidence does not show that Vercoe and Furber were authorized to make admissions that should be binding upon the company, but were simply to go over its books at the request of a syndicate of stockholders, and was grounded upon the fact that there was no showing in the books of the company that the certificates had been transferred, and upon the statement of Mr. Sherman. That report is shown to have been erroneous in many respects, and was based, in many instances, on mere rumor and the statements of parties interested adversely to the company, and the record shows that whenever the company was called upon to re-issue this stock it denied the right of Sherman, before the assignment, and of appellant, his assignee.

Upon the question of *laches,* and after reviewing the conduct of Sherman with reference to this entire transaction, the master says: "He slept upon such rights as he may have had for forty years, and after the last man [Francis H. Benson] who was familiar with the facts

died, in 1895, he filed his bill in the suit at bar. Sherman and his assignees are guilty of *laches*. He did not even make his claim in said Lansingh suit, which was begun two years after he discovered he had lost certain certificates and when the value of the certificates had begun to be apparent. One important principle involved in the term *laches* is, that after a long lapse of years, during which testimony is impaired or destroyed, witnesses remove or die, their recollection is dimmed or lost, and papers, letters, documents, books, records, etc., are lost or destroyed, or if not lost or destroyed are in the hands of persons not familiar with their contents, liable to misinterpret them, unable to supply their defects or correct the same or explain them from the memory of living witnesses, the defendant is at the complete mercy of any claimants who may wish to take advantage of the situation. Time impairs and destroys evidence of the true facts, and makes it practically impossible to meet positive testimony of the complainants, whether the same be true or untrue. A court of equity, therefore, finding itself unable to render substantial justice between the parties, asserts the principle of *laches* on the ground of public policy and for the repose of property rights." This declaration of the master is in entire harmony with our view of what is shown by this record and the law applicable to it.

The proposition that appellant stood in such fiduciary relation to the cemetery company that the purchase by him of this right of action must be held to have been for the benefit of the company, and that equity would not permit him to prosecute the suit in his own behalf, we deem it unnecessary to review or pass upon. Sufficient has been said to make it incumbent upon us to affirm this judgment.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*