## MULLINS v. DE SOTO SECURITIES CO., Inc., et al.

No. 257.

District Court, W. D. Louisiana, Shreveport Division.

July 6, 1942.

Eugene A. Nabors, of New Orleans, La., and Pyburn & Pyburn, of Shreveport, La., for plaintiff.

Clyde R. Brown (of Shotwell & Brown), of Monroe, La., and L. E. Colvin, of Mansfield, La., for defendants.

PORTERIE, District Judge.

The plaintiff in this stockholders' derivative or representative action is the owner of eighteen shares of preferred stock issued by DeSoto Securities Company, Inc., and the real defendants are the DeSoto Bank & Trust Company in liquidation, Federal Deposit Insurance Corporation, as receiver of DeSoto Bank & Trust Co. and individually, and The DeSoto Corporation. Plaintiff charges that the DeSoto Bank and its predecessor, the Bank of Commerce and Trust Co., as dominant stockholders of the DeSoto Securities Company wrongfully managed the affairs of the DeSoto Securities Company during the period from January 1, 1928, to October, 1936, in order to benefit the banks and The DeSoto Corporation, a wholly owned subsidiary of the banks, and damaged the DeSoto Securities Company in the amount of $92,420.57. It is charged that the officers and directors of the DeSoto Securities Company were also the officers and directors of the banks; that the banks owned all the common stock of the DeSoto Securities Company and entirely controlled and dominated the same. It is further charged that the Federal Deposit Insurance Corporation was appointed receiver of the DeSoto Bank in October, 1936, and that since then it has continued to wrongfully manage the DeSoto Securities Company to the detriment of the interest of the preferred stockholders, and that it has collected from the DeSoto Securities Company unreasonable amounts for rents, attorneys' fees and auditing expenses since October, 1936; that the present officers of the DeSoto Securities Company are agents and employees of the receiver, dominated by the receiver, and that these officers have refused to correct the alleged abuses or bring suit for the damages allegedly inflicted on the DeSoto Securities Company prior to its appointment as receiver, notwithstanding the demands made by plaintiff.

The court has before it now for consideration the defendants' motion for a rehearing on the motion to dismiss for failure to state a claim upon which relief can be granted.

In addition to the pleadings, the court also has before it answers by the defendants to several hundred interrogatories which were propounded by plaintiff and also many exhibits and records taken from the books and files of the DeSoto Securities Company which are made a part of the answer to the interrogatories.

■ Although these answers to interrogatories do not form a part of the pleadings, yet they are evidence in the record and can be considered by the court either under the Federal or Louisiana practice. See Federal Rules of Civil Procedure, 26 (d) and 56(c), 28 U.S.C.A. following section 723c; Fontenot v. Ludeau et al., 191 La. 540, 186 So. 21.

Defendants urge that the motion to dismiss should be sustained because of the following reasons:

In 1928 and prior thereto, The DeSoto Securities Company was doing business in Mansfield, Louisiana, dealing in securities, principally in notes secured by mortgages on automobiles and real estate. The Bank of Commerce and Trust Company, at Mansfield, Louisiana, as the owner of substantially all of the common, or voting, stock, was in a position to control the selection of the officers of the DeSoto Securities Company. The DeSoto Corporation was incorporated in 1929 as a real estate holding company and was an entirely owned subsidiary of the Bank of Commerce and

Trust Company. On June 25, 1929, the charter of the DeSoto Securities Company was amended to provide for the issuance of non-voting preferred shares, providing for dividends of 7% per year, payable semi-annually out of earnings, and $100,000 of preferred stock was issued, of which amount $88,300 is now outstanding, and of which plaintiff owns eighteen shares, or a total of 2.04% thereof. Dividends on the preferred shares have been in default since July 1, 1932. Plaintiff's mother acquired seventy shares of the preferred stock on July 1, 1929, and twenty shares on January 26, 1931. On August 26, 1935, she transferred these shares to her five children, each receiving eighteen shares by direct transfer in partial satisfaction of a liability to her children arising from her administration of their affairs as tutrix.

On January 20, 1931, the Bank of Commerce and Trust Company was recapitalized, and $198,000 of additional capital was supplied, after a heavy loss had been sustained through a shortage in the accounts of one of its officers and by depreciation of its assets. In 1933 the Bank of Commerce and Trust Company was closed and liquidated by the State Bank Commissioner of the State of Louisiana; and on March 29, 1933, all of the assets of said bank were sold by the liquidator, with approval of the District Court, to the DeSoto Bank & Trust Company, which assumed all liabilities of the liquidated bank. The last named bank was organized by former officers of the Bank of Commerce, and the directors were substantially the same. The DeSoto Bank acquired in this transfer all of the common stock of the DeSoto Securities Co., Inc. and of The DeSoto Corporation and thereafter continued to operate both corporations, some of the officers and directors of the bank also serving the two corporations.

The DeSoto Bank & Trust Company was closed by the State Bank Commissioner on October 9, 1936, and, as its current deposits were insured in accordance with the acts of Congress, the Federal Deposit Insurance Corporation was appointed and confirmed receiver thereof by the District Court for DeSoto Parish, on November 7, 1936, under Act 180 of 1934. The receiver took possession of the assets of the bank, including title to the common stock of the DeSoto Securities Company and of The DeSoto Corporation, and upon resignation of all officers and directors of the said two

companies, agents and employees of the receiver were elected as officers and directors thereof. This arrangement has been continued to the present, and, while the two corporations have been operated as going concerns, no new business has been undertaken, and they are in effect being liquidated. The receiver has been liquidating the DeSoto Bank and has paid to the creditors several liquidating dividends, and this liquidation is being continued.

The receiver of DeSoto Bank, in accordance with law, published a notice calling on all creditors to file claims, and the period for filing claims expired on March 15, 1937. See Sec. 4, Act 300 of 1910; In re Interstate Bank & Trust Co., 188 La. 211, 176 So. 1, 4.

It will have been observed that many of the events and occurrences related above transpired during the period of depression following the general economic collapse in October, 1929. We are familiar with the fact that there was an apparent recovery in general conditions in 1930, followed by another serious reverse in 1931 and 1932, leading to the general banking holidays throughout the nation in 1933. These general economic changes resulted in abandonment by the United States of the gold standard and the adoption by Congress in 1933 of the law providing for insurance of bank deposits.

The period in which it is alleged that the banks damaged the DeSoto Corporation is from January 1, 1928, to October, 1936, and the following summary of events and occurrences is given in order to show the sequence of events as they relate to the development of this suit:

1. July 1, 1929, preferred stock of DeSoto Securities Co. authorized and issued, and mother of plaintiff acquired, seventy shares thereof.

2. January 21, 1931, Bank of Commerce and Trust Co. recapitalized.

3. January 26, 1931, mother of plaintiff acquired twenty shares of DeSoto Securities Co. preferred stock.

4. July 1, 1932, DeSoto Securities Co. defaulted in its dividend on preferred stock.

5. January 16, 1933, Bank of Commerce and Trust Co. closed by State Bank Commissioner and subsequently liquidated under orders of state court.

6. February 7, 1933, order of court authorized the State Bank Commissioner as

liquidator to sell assets of Bank of Commerce and Trust Co. to DeSoto Bank.

7. March 29, 1933, DeSoto Bank purchased from liquidators all assets of Bank of Commerce and Trust Co.

8. August 27, 1935, plaintiff acquired from her mother shares of preferred stock of DeSoto Securities Co.

9. October 9, 1936, DeSoto Bank closed by State Bank Commissioner.

10. October 21, 1936, appointment as receiver accepted by Federal Deposit Insurance Corporation.

11. November 7, 1936, appointment of F. D. I. C. as receiver of DeSoto Bank confirmed by order of court dated November 7, 1936.

12. March 15, 1937, time for creditors to file claims with receiver expired.

13. May 26, 1939, notice or demand by Eugene A. Nabors for himself and as attorney for plaintiff addressed to DeSoto Securities Co. and its officers, demanding an action against the DeSoto Bank and certain former officers and directors of the Bank of Commerce and Trust Co. and the DeSoto Corporation.

14. January 31, 1940, present suit filed in state court.

One of the reasons heretofore assigned by the court for suspending action on the motion now being considered with the other pending motions was in order to provide the plaintiff with the information and facts which might be derived from the answers to interrogatories. These answers were filed in this court on April 5, 1941.

It appears that plaintiff had conducted some sort of examination of the books and records of the DeSoto Securities Company prior to December 3, 1938, as on that date the DeSoto Securities Company addressed a letter to her attorney furnishing certain requested information. (See Exhibit 7 attached to the answers to the interrogatories.)

Defendants have heretofore filed an exhaustive brief taking the position, for the reasons therein advanced, that plaintiff's suit should be dismissed for failure to state a claim on which relief can be granted, and, in addition to the arguments advanced in that brief, now urge that the entire record before the court shows that plaintiff has been guilty of laches and argue that this is a further reason for sustaining the motion to dismiss.

Admitting for the sake of argument that the banks as controlling stockholders of the DeSoto Securities Company dominated the management of the latter and that plaintiff's petition is sufficient to establish this relationship and the legal liability flowing from any wrongful acts of the banks, it is nevertheless urged that plaintiff has failed to allege facts upon which proof of actual damage can be based. Examining the detailed claims set forth in the petition previous to October 9, 1936, the date when DeSoto Bank was closed, we find the following:

| | | |
|---|---|---:|
| 1. | Damage claimed from dumping of worthless or semi-worthless securities. January 1, 1928, to October 9, 1936 (Paragraphs 27 through 32) | $75,705.57 |
| 2. | Overcharge for rent (Paragraphs 33 and 34) | 5,220.00 |
| 3. | Services in connection with Reconstruction Finance Corporation Loan (Paragraphs 35 and 36) | 10,000.00 |
| 4. | Overcharge for rent (Paragraph 52) | 1,495.00 |
| | Total amount prayed for... | $92,420.57 |

There are other allegations as to overcharges for auditors' expense and attorneys' fees, which are alleged to have accrued after the Federal Deposit Insurance Corporation became receiver of the DeSoto Bank, but the amounts are not stated in the petition and are not included in the amount of judgment sought.

To this point, the above long recital the court acknowledges is practically a verbatim copy from one of the briefs of defendants. We have found it to be fair and accurate. We have never done this before; but the labor and time required for an original contribution to the statement of facts in this case, so full of events and transactions, concerning a half-dozen corporations, over a period of time in excess of ten years, are not to be found and given unless the court were to set aside all its other duties for many months. As it is, we have given, by piecemeal, the full working time of at least one month to this case and opinion.

As the result of additional study of and application to this case since our previous Judgment on Motions, dated October 24, 1940, we must frankly make certain cor-

rections of the previous judgment. We said therein: "The final conclusion by the court in this motion to dismiss does not necessitate a definite arbitrament on the point; however, we espouse the theory in business practice that the past should not be too subject to perpetual scrutiny and review. The present and the future to move forward must have some degree of dependence upon the past." The suspended ruling there was on the question of whether or not the ownership of stock by the plaintiff at time of transactions under attack was an essential to maintain the representative action.

■ We must be definite and final at this time on the point. First, under the cases of United Electric Securities Co. v. Louisiana Electric Light Co. et al., C. C., 68 F. 673, 675, and Von Schlemmer v. Keystone Life Ins. Co., 121 La. 987, 46 So. 991, the Louisiana rule is clearly the same as the federal rule found in 23(b) of the Rules of Civil Procedure. This being true, much debate is avoided, such as the argument that since the Federal Rules can validly regulate only procedure, if the state law were different, the matter being one of substance, the federal courts would have to apply the state law by virtue of the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; and additionally there would be the other question as to whether or not the requirement is not an equitable principle of substantive character as is developed in the case of Home Fire Ins. Co. v. Barber (Roscoe Pound, Commissioner), 67 Neb. 644, 664, 93 N.W. 1024, 60 L.R.A. 927, 108 Am.St.Rep. 716; Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827; former Equity Rule 94, promulgated Jan. 23, 1882, 104 U.S. IX; Dimpfel v. Ohio & Miss. R. Co., 110 U.S. 209, 210, 3 S.Ct. 573, 28 L.Ed. 121; see McQuillen et al. v. National Cash Register Co. et al., 4 Cir., 112 F.2d 877, 882, second paragraph of headnote (7–9).

■ If there be doubt as to whether or not the Louisiana rule be a duplicate of the Federal Rule of Civil Procedure 23(b), under such circumstances the proper course seems to be to follow the rule laid down in Rule 23(b). Gallup v. Caldwell, 3 Cir., 120 F.2d 90, 95.

■ "* * * that the plaintiff was a shareholder at the time of the transaction of which he complains," Rule 23(b), is of major importance in the consideration of the motion to dismiss by defendants, for plaintiff, as previously indicated, acquired her preferred stock on August 27, 1935, and on that date, from the chronology of events set out supra, this financial drama was, for all practical purposes, concluded. It follows that the hundreds of transactions offered by the plaintiff in her petition as a basis for this action, beginning as early as January 1, 1928, to August 27, 1935, are not for our consideration. The plaintiff is burdened with implied notice— and, in this case, a study of the interrogatories and answers discloses actual notice— as to all of the transactions made the subject of the complaint in this representative action, and of such noteworthy local events as the recapitalization of the Bank of Commerce, the purchase of the Bank of Commerce by the DeSoto Bank, and, most important of all, the fact that the preferred stock when acquired on August 27, 1935, by plaintiff had defaulted on dividends since July 1, 1932.

A full study of the interrogatories and answers discloses that nothing occurred after August 27, 1935, as far as the DeSoto Securities Co. was concerned, for after that date it did no business but uninterruptedly continued in what is practically a self-liquidation. We quote paragraph 18 of the petition: "That since the date of receivership of the DeSoto Bank the Securities Company, although operated through the same forms used by a going concern, that is by shareholders' meetings electing a board of directors, which in turn elects officers who manage the corporation as distinguished from the procedures established by the Securities Company's charter and the laws of the state for liquidation through private and judicial supervision, has ceased to do new business, and, in fact, has been in the process of liquidation, all thought and activities in its management being directed toward liquidating its assets. The fact of cessation of business has been the subject of recognition by the Supreme Court of Louisiana in the case of State v. DeSoto Securities Company, Inc., 189 La. 285, 179 So. 316 (1938), which held that the company was exempt from the state's occupation tax because it had ceased to engage in business." (Italics supplied.)

The following quotation from our "Judgment on Motions" we desire to make a part of this opinion:

"The court has not failed to notice the strong meaning and import of Section 13 (Louisiana) Act 250 of 1928, providing: 'Except as otherwise provided in the articles and referred to in the certificate of stock, each share shall be in all respects equal to every other share.'

"We have considered, too, how the principle of equality of shares has received approbation in cases in the lower federal courts, cited by plaintiff's counsel, as well as how support for the principle has come from some writers in law reviews. Shares, however, may still be equal, yet various holders of them, because of equities, may not be enabled to make equal use of them."

We wish particularly to reverse ourselves on that which we said in the previous "Judgment on Motions" as to plaintiff having acquired the preferred stock through "operation of law." The plaintiff's widowed mother, individually and not as natural tutrix, bought seventy preferred shares of the DeSoto Securities Company on July 1, 1929, and again twenty shares on January 26, 1931.

"On August 26, 1935," plaintiff says in her amended petition, "Mrs. Sallie M. Nabors and her five children, then living, including the plaintiff, signed an agreement of compromise fixing the amount of her liability as tutrix to her children and conveying certain lands in partial satisfaction of such liability, said agreement of compromise being recorded at page 409, volume 109, Conveyance records, DeSoto Parish, Louisiana.

"That in partial satisfaction of the liability established by the agreement alleged in the preceding paragraph of this amended petition, Mrs. Sallie M. Nabors transferred to each of her children, a one-fifth interest in her preferred shares in the Securities Company, and on August 27, 1935, the Securities Company re-issued such preferred shares to the said children, the plaintiff receiving Certificate No. 169, dated 8–27–35, for 18 shares, which are the same shares of which the plaintiff's ownership is alleged in the original petition.

"That although the plaintiff received her preferred share certificate in the Securities Company on August 27, 1935, by virtue of the method of administration of her property by her mother as tutrix as alleged above in this amended petition, the plaintiff had an equitable interest in each of the shares recorded in the name of Mrs. Sallie M. Nabors, the earliest of which were issued on July 1, 1929, and plaintiff's preferred share certificate number 169 is a continuation of the plaintiff's equitable interest in the certificates issued in her mother's name."

Our appreciation of the above statement is that under the succession laws of Louisiana the present plaintiff is just an ordinary holder of her preferred stock as of August 27, 1935, and has not acquired through operation of law, and holds no equitable title presumably reverting to July 1, 1929. Plaintiff's mother invested privately and individually and not as natural tutrix, and the five children, upon attaining majority, accepted the stock in part settlement from their mother as they would have taken cash or any other form of payment; and under the application of Rule 23(b) the plaintiff is precluded from attacking transactions of the corporation previous to the date of acquisition, August 27, 1935. See McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877, 882, under headnote (7–9), and all cases cited therein.

The legal conclusions made by plaintiff in the three paragraphs quoted above from the supplemental and amended petition are inappropriate and are not permissible legal conclusions deducible from the facts.

To make doubly sure of our position, we left the field of pleadings and we requested the actual documentary evidence.

We secured a certified copy of the inventory, State of Louisiana, parish of DeSoto, Tutorship of Minors of Eugene A. Nabors, deceased, dated March 28, 1913. In this inventory, of course, no stock in the Securities Company appears. The fact that it does not appear, however, shows with certainty that no such stock passed from the estate of the father to the plaintiff. It indicates that the surviving wife of Eugene A. Nabors, deceased, bought the preferred stock as previously outlined; that purchase was made by the surviving widow personally and individually, and not as natural tutrix, as no court order of any character appears authorizing such investment—nor is this type of investment of minor's funds permitted by court order under the Civil Code of Louisiana, Art. 348.

The other document, through a certified copy, that has been brought into the record is one dated August 26, 1935, wherein Mrs. Sallie M. Nabors, widow of Eugene A. Nabors, entered into an agreement

which purportedly is an absolute settlement by her with her children, now of age, issue of the marriage with Eugene A. Nabors, of the amount of $50,000, the exact portent of which agreement is best expressed by the following paragraph taken from it: "Whereas, as a consequence of the advice received from experienced attorneys to the effect that to comply with all legal formalities attendant upon the administration of property in which minors were interested would involve unnecessary delay, excessive legal expenses, and would be of no practical benefit, all property, funds and revenues belonging to such minors, parties of the second part herein, were expended, invested and dealt with by party of the first part as her own property, without regard for the interest therein of parties of the second part, or the requirements imposed by law upon persons dealing with property owned by minors, so that party of the first part is now personally indebted to parties of the second part for the total amount of such income and revenues, which indebtedness is by all parties hereto, by way of compromise, fixed at the sum of Fifty Thousand & No/100 ($50,000.00) Dollars."

In this document preferred stock of the Securities Company is not listed.

So it is absolutely impossible to give a right to plaintiff on the plea "that his share thereafter devolved on him by operation of law," Rule 23(b) (1), previous to the acquisition by her, as shown by the record when the preferred stock was issued to her, that is, the date of August 27, 1935. All documents are contrary to and refute any equitable rights in favor of plaintiff previous to this date.

To determine the merits of the motion now before the court, it becomes necessary to analyze the petition together with the facts disclosed by the answers to the interrogatories with particular reference to the items of damage previously set out.

Taking the separate items of damage under the general classification of "dumping of worthless or semi-worthless securities," it is found that the first item for damages is in the sum of $50,000 resulting from "wrongful transfers from the parent banks' portfolios to the DeSoto Securities Company of worthless and semi-worthless notes." There is no specification of separate items of damage, i e., by description of the note which would give the name, the amount or the date. Generally, it is

alleged in paragraph 29 that the dumping practice continued from January 1, 1928 to October, 1936; but it is alleged in paragraph 18 that the DeSoto Securities Company had ceased to do new business and had been in process of liquidation since 1932, and, in support of this allegation, plaintiff cites the case of State v. DeSoto Securities Company, Inc., 189 La. 285, 179 So. 316. In said case the Supreme Court of the State of Louisiana held that the DeSoto Securities Company did not owe a license tax for 1933 and 1934 because it had ceased to do a lending business. Therefore, it may be assumed that the alleged "dumping practice," if it existed, ceased in 1932.

The only specific items mentioned in the interrogatories refer to the Taylor mortgage (Interrogatories numbered 83 and 84), Campbell note (Interrogatories numbered 85–87) and four notes mentioned in interrogatory number 63, which are the Moseley, Williams, Rogers and Stribling notes. The answers show the following in reference thereto:

(1) The Taylor mortgage notes in the amount of $7,000 were acquired from the Bank of Commerce and Trust Company in 1925, and ultimate recovery was had thereon in excess of $12,000. (Answer to Interrogatory No. 84)

(2) The Campbell notes were acquired from the Bank of Commerce and Trust Company in 1929 and 1930, apparently amply secured at the time, but there may be an ultimate loss on the principal of $1,557.64. (Answers to Interrogatories Nos. 86 and 87)

(3) The Moseley, Williams and Rogers notes were acquired from the Bank of Commerce and Trust Company in 1929 and 1930, and the DeSoto Securities Company has acquired the properties covered by mortgage securing these notes. There is nothing in the record to indicate a loss on these transactions. (Answer to Interrogatory No. 64 and Exhibit 7)

(4) The Stribling note was acquired in 1931 from the Bank of Commerce and Trust Company, and has been paid in full. (Answer to Interrogatory No. 64 and Exhibit 7)

Certainly it cannot be said that these instances disclose any general practice of dumping of worthless or semi-worthless notes and, so far as the record discloses, the plaintiff has not indicated that she knows of any other instances.

■ Paragraph 31 of plaintiff's petition alleges damages of $23,205.57 through wrongful transfers of the Bank of Commerce and Trust Company stock from the bank to the DeSoto Securities Company. Neither the dates nor other identifying data are set forth. Interrogatories numbered 88 through 91, and the answers thereto, show that in 1930 the DeSoto Securities Company acquired 56 shares of the Bank of Commerce and Trust Company stock, apparently standing in the name of one Provost, an absconding officer of the DeSoto Securities Company, at an apparent cost of $150 per share. Inasmuch, however, as the DeSoto Securities Company was reimbursed a portion of this cost by the Bank of Commerce and Trust Company, the net cost to the DeSoto Securities Company for said stock was $66 per share (Answer to Interrogatory No. 90(c). Shortly after the acquisition of said stock the bank was recapitalized and the DeSoto Securities Company and all other stockholders of the bank received two shares for each one held by them in the bank, which shares were valued at $33 per share. The DeSoto Securities Company, at the same time, subscribed for 248 additional shares at the value of $33. The record clearly indicates that the officers and directors of the bank joined with other stockholders, including the DeSoto Securities Company, in supplying the additional capital of $198,000 and accepted shares therefor valued at $33 per share. (Interrogatories numbered 115 to 123 and answers thereto.) There is nothing to show that the DeSoto Securities Company paid more per share than did other stockholders of the Bank of Commerce and Trust Company.

Paragraph 32 of plaintiff's petition alleges damages of $2,500 through transfers of the DeSoto Securities Company preferred stock. The pleadings do not identify these transfers. Interrogatory number 125 and the answer thereto shows that apparently the Bank of Commerce and Trust Company, as broker, acquired all of the preferred stock of the DeSoto Securities Company, resold and repurchased the same from time to time, without profit. On October 31, 1932, the Bank of Commerce and Trust Company returned $10,000 of same to the DeSoto Securities Company at par. Whether this was stock obtained from the DeSoto Securities Company for purposes of resale does not appear. There is nothing to indicate that the Bank of Commerce and Trust Company profited thereby. All of this occurred prior to the liquidation of the Bank of Commerce and Trust Company *under court supervision*.

■ Paragraphs 33 and 34 aver rent overcharges by the banks against the DeSoto Securities Company from January 1, 1928, to October, 1936, totaling $5,220. Of this amount $3,750 was alleged to have accrued prior to April 1, 1933, and $1,470 thereafter. The pleadings do not otherwise identify this claim, but the answers to interrogatories 128 to 131 disclose that the amount charged for office rent included heat, light, water and janitor service at rates varying from $60 monthly to $125 monthly. When the magnitude of the business conducted by the DeSoto Securities Company is taken into consideration, these amounts do not appear excessive and there are no allegations of fact to indicate that they were excessive.

■ The claim is made in paragraphs 35, 36 and 37 of plaintiff's petition that on March 23, 1933, the DeSoto Bank secured a loan of $249,008.07 from the Reconstruction Finance Corporation which was effected by having the DeSoto Corporation execute a note and deliver collateral to the DeSoto Securities Company, which, in turn, repledged the same to the Reconstruction Finance Corporation, obtained the money and loaned it to the DeSoto Bank. It is admitted that this money was repaid by the DeSoto Corporation, but it is claimed that the DeSoto Securities Company was damaged by the risk and the increased cost of bookkeeping and the fidelity bonds made necessary as a result of handling the loan. Interrogatories 142 to 147 and the answers thereto show that all payments were made direct by the DeSoto Corporation to the Reconstruction Finance Corporation, and there is nothing to indicate any increased cost of bookkeeping or increased bond premiums. No basis is set up under which damages to the DeSoto Securities Company could be calculated.

In paragraph 52 of plaintiff's petition it is set forth that after the Federal Deposit Insurance Corporation became receiver of the DeSoto Bank it continued to overcharge the DeSoto Securities Company for rent. The total of the overcharge alleged upon is $1,495. Here again, this item is not otherwise identified, and answer to interrogatory 132 shows that the amount charged was $60 per month and included heat, light, water and janitor service. It

is also to be noted that the answer to said interrogatory shows that, except for a small amount paid from November, 1936, to March 1, 1937, the DeSoto Securities Company did not have any expense for salaries and all clerical services have been furnished by the DeSoto Corporation.

■ In addition to the items of damage covered by the prayer of the petition and hereinabove outlined, we find several general allegations as to damages which are not included in the prayer and which should not be considered. Paragraphs 38 to 40 state that the DeSoto Securities Company was deprived of valuable mineral lands, but only make a general statement without reference to dates, values or descriptions of property. Interrogatories 18 and 31 addressed to the DeSoto Corporation and its answers thereto indicate that several properties were acquired by the DeSoto Corporation from the DeSoto Securities Company and also that several properties were acquired by the DeSoto Corporation on foreclosure of mortgages held by the DeSoto Securities Company. There is nothing to indicate either loss by the DeSoto Securities Company or substantial gains by the DeSoto Corporation from oil and gas leases executed on these properties.

The plaintiff charges in vague and general terms that the DeSoto Securities Company has been damaged through excessive charges for attorneys' fees and auditors' expense, and that the receiver plans to levy a liquidating fee out of the assets of the DeSoto Securities Company.

No specific allegations are made covering these items and the interrogatories referring to the same and the answers thereto do not disclose any conceivable basis for these suspicions and conjectures.

■ Plaintiff's petition charges that the receiver was negligent in failing to prosecute the action now being brought by her, but there is no averment that the receiver or its agents or the newly elected officers of the DeSoto Securities Company had any knowledge of the alleged claims in favor of the DeSoto Securities Company prior to the demand, which was some two years subsequent to the expiration of the period for the filing of claims against the receivership. Plaintiff seeks to charge the Federal Deposit Insurance Corporation with negligence in failing to discover and prosecute the alleged claims on behalf of the DeSoto Securities

Company without alleging any facts which brought knowledge of such claims to the officers of the DeSoto Securities Company or to the receiver. Plaintiff makes no effort to exculpate herself from negligence in failing to make any such effort prior to 1938 despite the fact that plaintiff acquired stock in 1935 which was then three years in default on interest dividends.

It is significant that plaintiff has not joined in this suit the former officers and directors of the two banks in question or the former officers and directors of the DeSoto Securities Company, who are, in fact, the persons alleged to have been guilty of wrongfully managing the DeSoto Securities Company to its detriment and for the benefit of the two banks. Neither has she joined the persons who are alleged to have guaranteed the liabilities of the Bank of Commerce and Trust Company.

■ These are the parties who committed the acts complained of and who should have been made parties defendant (Thompson on Corporations, Vol. 6, p. 553), but no relief is demanded against them.

The parties defendant are managed by persons who have no independent knowledge of the acts and things complained of by plaintiff. If the parties who are alleged to have been guilty of the wrongful acts were parties defendant to this suit, they would necessarily have an interest in assisting and cooperating in developing all true facts in connection with the matters complained of. Especially would this be true if they were asked to respond in damages.

It is to be recalled that the plaintiff in this action owns 2.04% of the stock of the DeSoto Securities Co. If defendants are forced to trial upon the vague and general allegations of plaintiff's petition, there would have to be expended a very large sum of money for auditing the books involved, covering a period of more than twelve years. Certainly defendants are not required to incur such expense each time a discontented stockholder might become suspicious of the motives of the corporate management. If this procedure were permitted, it is easy to see that the resources of the defendants might easily be exhausted in order to satisfy mere suspicions.

Pertinent here is language appearing in the case of Isaac v. Milton Manufacturing Co., D.C., 33 F.Supp. 732: " * * * If the board of directors and the stockholders of corporations were required to investigate

and act on complaints of a small group framed as the above, they would be continually harassed by similar letters from minority shareholders whose sole complaint was dissatisfaction with a course of conduct which might actually be perfectly sound in the exercise of good business judgment." 33 F.Supp. at page 736.

See, also, Corbus v. Alaska Treadwell Gold-Mining Co., 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256.

It is clear that plaintiff has been guilty of laches in this case. Plaintiff waited for more than two years after the claim against the DeSoto Bank, in receivership, had become barred under Louisiana Act 300 of 1910 before calling to the attention of the receiver and of the newly elected officers and directors of the DeSoto Securities Company any possible claim the DeSoto Securities Company might have. Plaintiff acquired her stock in 1935, at a time when the interest dividend thereon was more than three years in default, and held the stock for more than one year while the DeSoto Bank was open and a going concern. The former officers and directors of the banks in question and of the DeSoto Securities Company are now out of office and the management of these concerns is now in the hands of persons who must rely entirely upon the books, papers and records in the offices of the banks and of the DeSoto Securities Company. It is fair to assume that many of the former officers and directors or employees with knowledge of the affairs have died, moved away, or for other reasons will be unavailable. Since none of them is made a party to this suit, he would have no particular interest in defending this action or in furnishing to the present defendants any assistance.

"One important principle involved in the term 'laches' is that, after a long lapse of years, during which testimony is impaired or destroyed, witnesses remove or die, their recollection is dimmed or lost, and papers, letters, documents, books, records, etc., are lost or destroyed, or if not lost or destroyed, are in the hands of persons not familiar with their contents, liable to misinterpret them, unable to supply their defects, or correct the same, or explain them from the memory of living witnesses, the defendant is at the complete mercy of any claimants who may wish to take advantage of the situation. Time impairs and destroys evidence of the true facts, and makes it practically impossible to meet positive testimony of the complainants,

whether the same be true or untrue. A court of equity, therefore, finding itself unable to render substantial justice between the parties, asserts the principle of laches on the ground of public policy and for the repose of property rights." Dempster v. Rosehill Cemetery Co., 206 Ill. 261, 68 N.E. 1070, 1074.

A portion of the syllabus in the case of Isaac v. Milton Mfg. Co. et al., supra, reads:

"Where ignorance of right or wrong is relied on to account for laches, facts must be plainly alleged in bill and general averment of plaintiff's ignorance of his right is insufficient, but he must allege why he was so long in ignorance and the means to keep him so, and must acquit himself of all knowledge of facts which would put him on inquiry.

"Nothing will call a court of equity into activity but conscience, good faith, and reasonable diligence."

Under no theory could the Federal Deposit Insurance Corporation, receiver, be held responsible in this action under the allegations of plaintiff's petition and under the facts as disclosed by the answers to the interrogatories.

" * * * So a receiver is not personally liable * * * provided he acts in good faith and with ordinary care and prudence. Thus a receiver, acting in good faith and within the authority conferred upon him, is not liable in his personal capacity for losses resulting from pursuing ordinary business customs, or from mere mistake of judgment, or failure to insure property or to sue for a debt; * * *" 53 C.J. Verbo, Receivers, § 225.

The affidavit of Mr. Francis E. Powell, the local agent for the F. D. I. C., in the record shows "That he was elected President of the DeSoto Securities Company, Inc. on or about December 1, 1936; that previous to on or about October 21, 1936, when said appearer was appointed as Liquidator for Federal Deposit Insurance Corporation in its capacity as Receiver of DeSoto Bank & Trust Company of Mansfield, Louisiana, said appearer had no knowledge or information whatever concerning the affairs of the DeSoto Securities Company, Inc.; that previous to October 21, 1936 appearer had resided outside of the State of Louisiana and had never had any connection with either the DeSoto Securities Company, the DeSoto Bank & Trust Company, the

Bank of Commerce and Trust Company or The DeSoto Corporation."

Now, on what basis is it claimed that the receiver is personally liable? First, that if any claim of the DeSoto Securities Company has been lost or barred, same was due to wrongful neglect of the receiver in asserting the same; and, second, that the receiver has caused the DeSoto Bank, in liquidation, to collect excessive rents, attorneys' fees, auditors' expense and plans to collect an excessive "liquidating fee."

So far as the petition is concerned, there is no charge that the receiver knew of claims in favor of the DeSoto Securities Company which should be asserted; and the vague charges concerning rents, attorneys' fees and auditing expense present no issue of fact whatsoever.

It can not be said that the receiver committed a wrong when it exercised the rights as owner of all common stock, upon resignation of the former officers and directors, to select the officers and directors of the DeSoto Securities Company.

As to alleged damages prior to October, 1936, there is nothing in the petition to charge the receiver, or its agents, with knowledge thereof or with receiving knowledge of facts which should have caused it to make an investigation. The fact that the bank of which it became receiver had owned all common stock and dominated the management of the DeSoto Securities Company did not carry a presumption that the bank had committed acts of mismanagement and fraud.

So far as the charges regarding excessive rents, attorneys' fees and auditing expense are concerned, there is no charge that the receiver was profiting personally.

The answers to interrogatories reveal that the receiver did have its auditors examine the affairs of the DeSoto Securities Company and that the results thereof did not reveal any fraud, mismanagement or irregularities.

There has been mutual patience and considerable cooperation between the attorneys in this case and the court. On May 9, 1942, the court addressed to the lawyers on both sides the following letter:

"My dear Sirs:

"The Court is fortunate in that this case has able advocates on both sides.

"Without it being any indication of our final ruling, we need your services. The following questions are to be answered by you, and you may take until June 1st to do so, as we shall have to be at sessions of the court at Shreveport and Lake Charles for the rest of the month:

"(a) Definitely, just what transactions, if any, occurred between August 26, 1935, date of acquisition by plaintiff of shares of the Securities Company, and May 26, 1939, date of plaintiff's letter-demand for action, made on the DeSoto Securities Co., Inc.?

"(a–1) After the above is fully answered, please list the transactions, if any, from the number above given, occurring between October 21, 1936, the date of acceptance by the F. D. I. C. from the State Bank Commissioner of the receivership of DeSoto Bank, and May 26, 1939, the date of the letter-demand.

"In answering, please bear clearly in mind that the transactions must be freshly injurious in character and must not be of the nature of the continuation or the consummation of supposedly injurious transactions of real origin previous to August 26, 1935.

"(b) This question has the same content as question (a), except that the answers to it may be both factual and argumentative, and should indicate how and why the transactions occurring between the two dates are 'the result of cumulated acts begun before August 26, 1935, but on that date still in progressive action and movement to a culmination later than August 26, 1935.' (Language borrowed from our Judgment on Motions, dated October 24, 1940.)

"(c) Outline in detail the character of activities, if any, of Francis E. Powell in the financial drama before the date of acceptance by the F. D. I. C., October 21, 1936.

"The source for all the above answers must be contained either in the petition of the plaintiff or must have been brought out in the hundreds of interrogatories and the present answers, or are to be encompassed by the unanswered interrogatories."

One of the acts which occurred after the date of acquisition by plaintiff of her stock and for which recovery is sought is the purportedly wrongful repayment by the Securities Company to the DeSoto Bank in liquidation of an indebtedness amounting to $16,225 (answer to Interrogatory 200 (b), described in the petition as being "wrongful transfers of worthless or semi-worthless notes and other securities." The origin of the transactions to this amount oc-

curred prior to 1935 and consequently prior to the date that plaintiff became a stockholder. The payment of this sum was merely the eventual consummation of the previous obligation. The contention of plaintiff fails. Toebelman v. Missouri-Kansas Pipe Line Co., D.C., 41 F.Supp. 334. Further, the substance of this item was inventoried by the state bank commissioner as an asset of the DeSoto Bank at the time of this bank's closure, as provided for in Section 3, Act No. 300 of 1910. The receiver was charged with legal responsibility for the collection of this obligation. The inventory was a matter of public record. Any claim for refund of this amount from the receivership is a claim against the receivership, and in no way could the F. D. I. C. in its official capacity become involved—as no knowledge of any irregularity, if there be any, in the prior management of the Securities Company is shown in any of the answers.

There has been brought out by the replies to the above letter that the total sum repaid by the DeSoto Securities Company, Inc., to the DeSoto Bank & Trust Company in liquidation, since the date of acquisition by plaintiff of her stock, is really $34,550, inclusive of the above principal sum of $16,225. The difference necessary to arrive at the larger amount from the smaller amount is of the same character as above described, that is, the sum represents payment of transfers of occurrences before August 27, 1935. (Answers to Interrogatories Nos. 157, 199, 200.)

The court finds that the allegations of plaintiff in her petition, when she says that "worthless or semi-worthless notes and other securities" were "dumped" by the banks to the detriment of the DeSoto Securities Co., Inc. are not items with any degree of particularity. How could we conscientiously order the examination of the financial past of the DeSoto Securities Company, Inc. for an indefinite period prior to August 27, 1935, in order to determine whether the assets of the Securities Company were improperly pyramided, etc.?

Another item discussed by the answers contained in the above-quoted letter is that the DeSoto Securities Company, Inc. paid the DeSoto Corporation for rent and other services at the rate of $60 per month, or a total of $2,520. Plaintiff in her petition alleges that this was $35 per month too much, or that a deduction should be had of $1,470. Amounts of this character are inconsequential. (Answers to Interrogatories Nos. 131 and 132.) The acts of the majority of the officers and directors of the corporation, even where there might be a mistake in judgment, may not be attacked. See concurring opinion of Justice Brandeis in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, at page 481, 80 L.Ed. 688, from which we quote: "Within recognized limits, stockholders may invoke the judicial remedy to enjoin acts of the management which threaten their property interest. But they cannot secure the aid of a court to correct what appear to them to be mistakes of judgment on the part of the officers."

The answers further develop that amounts of $440.83, $945.38 and $332.64 were paid unnecessarily by the DeSoto Securities Company, Inc. on the fidelity bond insuring against loss on the default of its officers and employees. This grooves with the reasoning immediately above given. (Answer to Interrogatory No. 147.)

It further develops that the amounts of $775.20 and $49.76 were paid by the Securities Company for salaries and expenses of auditors and special representatives. These are of the same character as the two items above and are disposed of in the same manner. (Answers to Interrogatories Nos. 192 and 195.)

The final amounts appearing to be involved are those paid for attorneys' fees by the DeSoto Securities Company, to-wit: $810 in 1937; $2,157.55 in 1938; $692.12 in 1939. The answer to Interrogatory No. 212 would show clearly that these are not excessive or exorbitant.

As to indebtedness on the note in favor of Reconstruction Finance Corporation amounting to $157,668.78 on December 31, 1935, and being reduced by payments made by the DeSoto Corporation to the sum of $84,026.56 by June 28, 1937, answer to Interrogatory No. 161 will explain clearly and readily that this was for an obligation antecedent to the date of plaintiff's acquisition of her stock.

On the contention made by plaintiff that the Securities Company was actually liquidating its affairs after October 9, 1936, which date is commonly admitted as being the date of cessation of doing new business, but that any amounts paid under this principle of attending to the dying embers of the former business should be declared wrongfully paid and that plaintiff has a right of ac-

tion for such because of the date of payment being subsequent to plaintiff's acquisition of her stock, the court must find that these payments were merely the consummation of obligations that antedated the date of acquisition of her stock, and objection thereto is precluded because of her direct or implied notice. It is the original act that is the source of injury, if there be any injury.

· Consequently, after the careful examination of the answers made by both sides to the questions contained in the letter, and with reference to the particular interrogatories and answers, noting their respective contentions, we have concluded that there has been no transaction between August 27, 1935, date of acquisition by plaintiff of her shares, and May 26, 1939, date of plaintiff's letter-demand for action, of the character necessary to support the derivative action sought by plaintiff. What is shown by the answers of both sides is merely the final consummation by payment of obligations of origin antedating the date of acquisition by plaintiff of her shares—as to all of which transactions, either through direct or implied notice, she is not allowed to complain. Additionally, it is clear from these answers and from the affidavit of Mr. Powell that the Federal Deposit Insurance Corporation cannot be involved to the least degree.

As late as June 1, 1942, the plaintiff filed a motion for joinder of parties plaintiff, on the contentions that (a) she is in the position of a fiduciary to the co-owners of preferred stock in the Securities Company, and (b) since the defendants insist with technical objections as to transactions attacked by plaintiff occurring prior to the date of plaintiff's acquisition of her stock, it is imperative that such co-owners of preferred stock be, by the court, made co-plaintiffs in this suit. The court considers that this issue is a public one of public record, and if there were aggrieved co-owners of preferred stock they could well file their own suits or join themselves in this suit, and the court does not consider it to be its duty to foment litigation or to compel parties to enter this suit. In good conscience we feel that to place these co-owners in this suit would be an improper and illegal act.

The plaintiff pleads also that, under 23 (c) of the Federal Rules of Civil Procedure, "A class action shall not be dismissed or compromised without the approval of the court." However, in Hutchinson v. Fidelity Inv. Ass'n, 4 Cir., 106 F.2d 431, 436, 133 A.L.R. 1061, the court said: "The notice therein provided for is required in case of voluntary dismissal or compromise of a class action, so as to limit the power of the named plaintiff to terminate the suit which he has brought for others as well as for himself. It was never intended, of course, that such notice should be a condition precedent to dismissal by the court after hearing on the merits." The motion to dismiss sustained in this case is undeniably a "hearing on the merits." See Pelelas v. Caterpillar Tractor Co., 7 Cir., 113 F.2d 629.

On June 8, 1942, plaintiff filed a "Brief and affidavit showing that plaintiff's stock certificate represents a continuation of a one-fifth interest in the rights which Mrs. Sallie M. Nabors had in each of her preferred stock certificates." We do not think this brief and affidavit change the status. Granting that the children, five in number, each received his virile share, that is, one-fifth of all the stock, and it was an acceptance by them of the money that their mother owed them, there is an absolute change of title in the stock certificate; the acquisition is not by operation of law; the purchase had not been made as natural tutrix, nor, as would be said at common law, "in trust" for the children. The children, under the laws of Louisiana, did not have to take the stock certificates in payment of any amount due them by the mother. It matters not that an affidavit is made by Mr. W. F. Moore, Secretary-Treasurer of the DeSoto Securities Co., Inc., on June 8, 1942, wherein he says "that the certificates issued to each of Mrs. Sallie M. Nabors' children represented a 're-issue' of the certificates which Mrs. Nabors held." His characterization is unavailing to the plaintiff. We still characterize the situation as before in that the date of acquisition by the present plaintiff of her stock was August 27, 1935.

Plaintiff had filed earlier a motion to compel defendants to make answer to a number of interrogatories out of the several hundred propounded to which defendants (one or the other) answered "I do not know" or "I have no such list."

To show the meaning of the above request we make a full quotation of question No. 59 as being illustrative:

"Is it a fact that the Bank of Commerce and the DeSoto Bank followed the practice of making transfers of assets to the Securities Company and of having the Securities

 

Company refinance assets held by the said banks:

"(a) After the bank examiner or the Louisiana State Banking Department had disapproved the particular asset transferred or refinanced?

"(b) After the bank examiner or the Louisiana State Banking Department had disapproved the bank's general financial condition?

"(c) After the particular asset had attained a status which subjected it to disapproval by the state bank examiner or the Louisiana State Banking Department, but prior to actual disapproval?

"(d) After the bank's Board of Directors through the biennial examination of its assets which is required by statute, or through other examinations discovered that the particular asset was unsound?"

■ This question, in its four divisions, discloses that the subject matter of inquiry goes back to a period previous to the year 1933, for it is on January 16th of that year that the Bank of Commerce & Trust Company was closed by the State Bank Examiner; an answer would call for oral evidence as to statements made or not made by the State Bank Examiner, and of the opinion type. Interrogatories Nos. 65 to 71, and 74 to 76, classify similarly—and probably to a more objectionable degree. In view of the general tenor of this case, because of insufficient specific facts alleged and because of the general background of the law in this type of litigation, an order should not issue compelling an answer. The nearly impossible would be fulfilment of the court's request, and a mandate once issued would have to be enforced either by contempt proceedings or the expenditure of a substantial sum of money belonging to and accumulated by the Securities Company, Inc.

Should we not assume that in the instant case no other owner of preferred stock (and there are thirty-two) has joined the plaintiff in her action because (a) no one believes the previous transactions are of the character as alleged by the present plaintiff, and/or (b) because the co-owners of the preferred stock had rather make sure that they get their proportionate remittance from the cash assets of the Securities Company (an amount presumably around $50,000, as stated in argument) than to get a court to order a master, authorized to surround himself with auditors, clerks, bookkeepers, stenographers, etc., not to mention lawyers, and who will spend a substantial portion of this $50,000 to establish a very doubtful claim whose only solvent source of collection would be the F. D. I. C. From our study of the facts and the law, the F. D. I. C. cannot be made responsible. McNulta v. Lockridge, 141 U.S. 327, 12 S.Ct. 11, 35 L.Ed. 796; Frank Grocery Co. v. Texas & Pacific R. Co., 176 La. 180, 145 So. 372; Reynaud v. Uncle Sam Planting & Mfg. Co., 158 La. 1083, 105 So. 72; Fletcher, Cyclopedia of Corporations, vol. 16, Secs. 7864-7865; 53 Corpus Juris, verbo Receivers, §§ 224, 225.

■ Then, as a necessary alternative to the motion to compel answer, there has been a motion for accounting filed by the plaintiff on April 21, 1942, supported by the idea that the questions unanswered above would then find an answer. We cannot order such an accounting, to be fed by the good money belonging not only to the present plaintiff but to the great number of co-owners of preferred stock. The latter are silent and have remained so now since January 31, 1940, the date of the filing of this suit.

The motions to dismiss filed by the four defendants are sustained. Judgment will be signed upon presentation.